# FREDERICK KILLIE *v.* STATE OF MARYLAND

[No. 385, September Term, 1971.]

*Decided February 14, 1972.*

The cause was argued before ANDERSON, MOYLAN and GILBERT, JJ.

*William B. Evans* for appellant.

*Josef E. Rosenblatt, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Donaldson. C. Cole, Jr., State's Attorney for Cecil County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Frederick Killie, was convicted in the Circuit Court for Cecil County by a jury, presided over by Judge J. Albert Roney, of (1) possession of marihuana, (2) maintenance of a common nuisance, and (3) the distribution of marihuana. Upon this appeal, he raises three contentions:

(1) That the trial court erroneously denied his motion to suppress evidence;

(2) That the evidence was legally insufficient to per-

mit the case to go to the jury on the counts charging the keeping of a nuisance house and charging distribution of marihuana; and

(3) That the trial court erroneously denied his motion for a mistrial after allegedly improper remarks were made by the State's Attorney in his final argument to the jury.

The appellant was the principal of a public elementary school in Cecil County. (This was revealed to the jurors on their voir dire examination.) The State's key witness, Trooper Robert D. Sherman of the State Police, was assigned to the Elkton Barracks to work in an undercover capacity investigating possible violations of the narcotics laws. On the evening of September 19, 1970, Trooper Sherman went to the Four Corners Bar in Elkton at approximately 10:30 p.m. and there met George Joseph Baluta, a citizen-complainant who had two days earlier focused investigative attention upon the appellant here. Baluta was acquainted with the appellant. The appellant was also present in the Four Corners Bar on that evening, being in the company of an ultimate co-indictee, Robert Raech, and one Robert Cornelius. Baluta introduced Trooper Sherman to the appellant and all five persons engaged in general conversation.

As a part of his undercover role, Trooper Sherman generally ingratiated himself into the confidence of the appellant. In the course of their conversation, Trooper Sherman referred disparagingly to Elkton on a Saturday night as really "Dullsville." The appellant invited both Trooper Sherman and Baluta to his home. Trooper Sherman and Baluta left the Four Corners Bar, stopped by Baluta's residence to pick up two six-packs of beer, and journeyed on to the appellant's home on Russell Road in the Cherry Hill section of Elkton. They were both admitted by the appellant and led into the kitchen, where Raech was seated at the kitchen table. Trooper Sherman, from his professional experience, recognized the distinct odor of marihuana. He saw on the kitchen table a plastic

bag containing a greenish brown vegetable substance, two pipes and an ash tray.

Raech offered Trooper Sherman a pack of cigarettes. Trooper Sherman replied, "No, I don't smoke those." He was then handed one of the pipes which was unlit but filled with the greenish brown substance. Raech proceeded to light the pipe. Trooper Sherman simulated smoking the marihuana. After one simulated puff, he handed the pipe back to Raech, who deferred, saying, "Keep it. There is an unlimited supply of grass available." The appellant-host was present throughout this transaction. The pipe ultimately was passed back and forth, for sequential puffing, among Trooper Sherman, Raech and the appellant. It made the full circle "a couple of times."

After a prearranged signal was given by Trooper Sherman, another trooper, Leon Ordway, entered the house and placed the appellant and Raech under arrest. Seized were the two pipes, the ash tray full of residue and a plastic bag full of suspected marihuana. Chemical analysis revealed that the plastic bag did, in fact, contain marihuana and that the pipes and the ash tray revealed traces of marihuana.

The only other significant testimony was that of Baluta, who confirmed the testimony of Trooper Sherman with respect to the events of September 19, and who described an earlier encounter between himself and the appellant on September 17. On that earlier occasion, Baluta met the appellant at the Four Corners Bar and was invited by the appellant to visit his residence. He did so and described a small gathering in the kitchen which included Raech. He indicated that all participants were seated around a kitchen table smoking pipes. After having a pipe himself, he became drowsy and sat on the outside front steps to get some fresh air. The appellant came out, sat down beside him, put his arms around him and kissed him. The appellant urged Baluta to go upstairs and go to bed for a couple of hours. Baluta demurred.

This incident of September 17 was seized upon by the State's Attorney for a line of argument he pursued vigorously in final rebuttal to the jury. Our initial consideration is directed toward that argument, which is the basis of the appellant's third contention.

Taking this kissing of an apparently consenting adult (of tenuous relevance at best) as a factual point of departure and then proceeding on the basis of pure supposition, the State's Attorney, for the first time in final rebuttal argument, implanted in the minds of the jurors the unmistakable thought that this elementary school principal was using the lure of marihuana to entice young boys to his home for homosexual purposes. There was no curative admonition from the bench.

In the course of the final rebuttal argument by Mr. Cole, the State's Attorney, the following transpired:

"Mr. Cole: He was using this to attempt to get young boys there.

Mr. Evans: I object to that. That is completely out of line.

The Court: Just a moment, Mr. Evans.

Mr. Cole, I would stick to the testimony. You can refer to the one gentleman who testified, but making generalizations I think is incorrect. All right.

Mr. Cole: Well, I will try to be more specific. He kissed Baluta. Men don't kiss men. And what was he using it up there for? He was using it to entice people like Baluta up there.

Mr. Evans: I would object to that. There is no evidence of enticement. He can argue the law any way he wants, but the facts he ought to stick to.

The Court: Just a moment. The jury has to weigh the evidence and make their own conclusions.

All right, go ahead, Mr. Cole.

Mr. Cole: Well, we are getting back to kissing

Baluta again. I don't care what is going to happen after this. Anyway, Baluta said he invited him up there and kissed him. And Baluta didn't have any trouble getting a second invitation. He was a little passive perhaps but he didn't have any trouble. And Mr. Evans was trying to say he was just merely possessing it. But the only logical evidence from his keeping the stuff there was that it was to get boys there to have pot parties.

Mr. Evans: Now, I would object to that. Mr. Baluta is 26 years old.

Mr. Cole: Men. I will say men.

The Court: Mr. Evans, please don't interrupt now.

Mr. Evans: I didn't intend to, but let him stick to the truth.

Mr. Cole: I will say men. I will change it. He was using this to get men there. He tried to get our sympathy, but sympathy doesn't count in this type of case."

At this juncture, both counsel approached the bench. The appellant's counsel made a timely motion for a mistrial, *Holbrook v. State,* 6 Md. App. 265, 271, based upon the insinuation of homosexual activity. The court denied the motion. The decision as to whether to grant or to refuse a motion for mistrial is within the sound discretion of the trial court. *Holbrook, supra,* at 278; *Matthews v. State,* 3 Md. App. 555, 559. We feel, on the facts of this case, that the refusal to grant the mistrial was an abuse of discretion and that the appellant was denied a fair and impartial trial.

The introduction of the notion of homosexuality, especially on the part of an elementary school principal vis-a-vis "boys" or "young boys," added a totally foreign consideration to the case. It was an irrelevancy replete with strong potential for unfair prejudice. This was error. As we said in *Holbrook,* at 269:

> "Generally the prosecutor has an obligation to refrain from making any remark within the hearing of the jury which is likely or apt to instigate prejudice against the accused. Thus an appeal to racial or religious prejudice is improper . . . . Appeals to passion may so poison the minds of jurors that an accused may be deprived of a fair trial . . . . In short, the prosecutor should make no remark 'calculated to unfairly prejudice the jury against the defendant.' "

See also *Contee v. State,* 223 Md. 575, 582-584; *Wood v. State,* 192 Md. 643, 652; 23 A C.J.S., *Criminal Law,* Section 1105; Annotation, 78 A.L.R. 1438, "Counsel's appeal to racial, religious, social or political prejudice or prejudice against corporations as grounds for a new trial or reversal." Although most of the case law and legal literature deal with the subject of prejudice in the context of race, religion or nationality, we believe that the reasoning applies with equal vigor to an insinuation of homosexuality, especially with "young boys." In the absence of even an attempt at curative instruction, we are not persuaded, that the error was harmless. As we said further in *Holbrook,* at 270:

> "In applying this rule it appears that a significant factor in determining whether the jury were likely to have been misled or influenced to the prejudice of the accused by an improper remark is whether the trial court took appropriate action to overcome a likelihood of prejudice, e.g. informing the jury that the remark was improper, striking it and admonishing them to disregard it . . . . And in *Shoemaker v. State,* [228 Md. 462], and *Meno v. State,* [117 Md. 435], where such action was not taken by the trial court, the judgments were reversed."

Accordingly, we reverse the judgment of conviction and remand the case for a new trial.

Because it may provide some guidance in the event the State elects to proceed with a new trial, we will treat briefly the appellant's other two contentions.

The appellant's first contention is that the State trooper only gained the vantage point within the appellant's home from which he could observe criminal activity and from which he could observe incriminating evidence by a subterfuge. He claims this to be a violation of the Fourth Amendment. He reads the Amendment overbroadly. Its office is to protect persons against unwarranted physical intrusions carried out against the will and without the consent of the victim. It is not intended to guard against the mistaken belief, howsoever produced, which leads an occupant to the imprudent issuing of invitations. *Lewis v. United States,* 385 U. S. 206, is completely dispositive of the appellant's contention in this regard. In *Lewis,* a government undercover agent assumed the role of a narcotics addict and, in that guise, was invited into Lewis's apartment for the purpose of purchasing narcotics. Incriminating evidence was discovered by the undercover agent, was seized and was introduced at Lewis's trial. Lewis claimed that the entry into his apartment by means of a stratagem constituted a violation of the Fourth Amendment. He found support only in the lone dissent of Justice Douglas.

The appellant here seeks to distinguish *Lewis* on the ground that the invitation in the case at bar was issued for social purposes and not for commercial purposes. The appellant may find moral comfort in the concurring opinion of Justices Brennan and Fortas which upheld the conviction in *Lewis* solely on the ground that the use of the apartment for commercial purposes operated to divest it of Fourth Amendment protection. The majority opinion of Chief Justice Warren, speaking for six members of the Court, on the other hand, offers the appellant no such refuge. The Court held squarely that a government agent, "in the same manner as a private person," may accept invitations and may enter upon

premises "for the very purposes contemplated by the occupant." In commenting generally upon the need for undercover activity as an indispensable investigative technique, the Court said, at 208-209:

"His only contentions are that, in the absence of a warrant, any official intrusion upon the privacy of a home constitutes a Fourth Amendment violation and that the fact the suspect invited the intrusion cannot be held a waiver when the invitation was induced by fraud and deception.

Both petitioner and the Government recognize the necessity for some undercover police activity and both concede that the particular circumstances of each case govern the admissibility of evidence obtained by stratagem or deception. Indeed, it has long been acknowledged by the decisions of this Court, . . . that, in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents."

See *Grimm v. United States,* 156 U. S. 604, 610; *Andrews v. United States,* 162 U. S. 420, 423; *Sorrells v. United States,* 287 U. S. 435, 441-442. See also *Nutter v. State,* 8 Md. App. 635.

Indeed, criminal violations of the type involved in this case could seldom be detected except by the skillful employment of undercover investigation. As the Supreme Court went on, in *Lewis,* at 210:

"Were we to hold the deceptions of the agent in this case constitutionally prohibited, we would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional per se. Such a rule would, for example, severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims

who either cannot or do not protest. A prime example is provided by the narcotics traffic."

The appellant's second contention, although couched in terms of legal sufficiency of evidence, in effect involves statutory interpretation of two related subsections of Article 27, Section 286(a). Subsection (5) provides that it shall be unlawful:

"To keep or maintain any common nuisance which shall mean any dwelling house, apartment, building, vehicle, vessel, aircraft, or any place whatever which is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances or which is used for the illegal manufacture, distribution, dispensing, storage or concealment of controlled dangerous substances or controlled paraphernalia, as defined in subsection (d) of § 287 of this subheading."

The appellant argues that the evidence at bar did not show that the proscribed conduct in his home was of a "recurrent" or "repeated" nature. He looks to *Ward v. State,* 9 Md. App. 583, 593, and *Beard v. State,* 71 Md. 275, as support for his proposition that a "common nuisance" within the contemplation of Section 286 (a) (5) need be a place "habitually resorted to" for unlawful purposes or "habitually kept." Both *Ward* and *Beard,* however, were dealing with the common law offense of keeping a disorderly house.

It is not, in the factual posture of this case, necessary for us to decide whether the use of the phrase "common nuisance" in Section 286 (a) (5) or the use of the phrase "which is resorted to" contemplate that the offense must be of a continuing or habitual character, analogous to the offense of keeping a common law disorderly house. We need not decide the question here, because the evidence would support the conviction even if more than a single "resort" to the house for unlawful activity were required.

The violations of the law that occurred on September 19 are not disputed. We feel that the testimony of Baluta supports the reasonable inference that similar violations occurred on the evening of September 17. He testified explicitly, to be sure, only as to the "smoking of pipes." He did testify, however, that smoking a pipe "made him drowsy." He testified that the smokers on September 17 congregated in the kitchen as did the clearly-established marihuana smokers on September 19. The testimony as to September 19 established that marihuana was kept in the kitchen and that the "pipes" for smoking marihuana were kept in the kitchen. The three "smokers" of September 17—the appellant, Baluta and Raech—were three of the four "marihuana smokers" of September 19. The identical *modi operandi* of the smoking parties on the two nights support the rational inference that the same substance was being smoked on both nights.

Under the third count of the indictment, the appellant was found guilty of a violation of Article 27, Section 286 (a) (1), which makes it unlawful:

> "To manufacture, distribute, or dispense, or to possess a controlled dangerous substance *in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance;*" (Emphasis supplied)

He was found guilty explicitly of unlawful distribution. He argues that the very minimal quantity of marihuana "distributed" to Trooper Sherman as part of a shared pipe bowl for communal smoking was not adequate to constitute a "sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance." He misreads the statute. The qualifying phrase setting out the additional element that the controlled dangerous substance shall be "in sufficient quantity to reasonably indicate . . ." modifies only the act of possessing and not the subsection's alternatively proscribed acts of manu-

facturing, distributing, or dispensing. There is, therefore, no merit to his contention.

> *Judgments of conviction reversed; case remanded for a new trial; costs to be paid by County Commissioners of Cecil County.*