533 A.2d 928

**Jerome S. CARDIN**

v.

**STATE of Maryland.**

**No. 200, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Dec. 2, 1987.
Certiorari Denied March 28, 1988.

202

Aubrey M. Daniel, III (John K. Villa, Gerson A. Zweifach, Stephen D. Raber and Williams & Connolly, on brief),

Washington, D.C., George L. Russell, Jr. (Russell & Thompson, on brief), Baltimore, for appellant.

Dale P. Kelberman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Charles O. Monk, II, Deputy Atty. Gen. and Peter E. Keith, Asst. Atty. Gen., on brief), Baltimore, for appellee.

Argued before WEANT, GARRITY and BLOOM, JJ.

BLOOM, Judge.

A jury in the Circuit Court for Baltimore City convicted appellant, Jerome S. Cardin, of five counts of theft under Maryland's consolidated theft statute, Maryland Code Annotated, art. 27, § 342 (1957, 1982 Repl. Vol.). Appellant was sentenced to five concurrent fifteen year terms of imprisonment. In this appeal he makes numerous assertions of error with regard to the sufficiency of evidence, the jury instructions and the conduct of both the State and the trial court during *voir dire,* during the trial, and during closing arguments.

Finding no reversible error, we affirm the judgments of the circuit court.

### Facts

Jerome Cardin, a native of Baltimore City, was, at the time of trial, a 60-year-old attorney and businessman. He had formed Old Court Savings and Loan Association ("Old Court") as a stock savings and loan association[1] in 1959. Under Cardin's control, Old Court was a conservatively run institution. Even though Old Court generated no dividends for its shareholders, it was profitable until the late 1970's. In 1979, however, Old Court began to fail, primarily as a

---

1. In a *stock* savings and loan association, the corporation's owners own all the assets except for the accounts funded by the depositors. In contrast, in a *mutual* savings and loan association, all the assets are owned by the association's depositors.

result of rapidly rising interest rates, and by August 1982 it had a negative net worth. The Maryland Savings Share Insurance Corporation ("MSSIC"), a private insurance authority that participated with the State in regulating the savings and loan industry, advised Old Court to seek an injection of fresh capital through a merger or sale of the association.

At MSSIC's direction, Cardin began negotiations to sell Old Court or to merge it with a stronger institution. In September 1982, MSSIC's executive vice president introduced Cardin to prospective buyers, Jeffrey Levitt and Allan Pearlstein. Cardin, Levitt and Pearlstein eventually entered into a written agreement ("the sale agreement") whereby Cardin sold controlling interests in the institution to Levitt and Pearlstein, retaining only an 18% ownership interest in Old Court.

As part of the sale, Cardin negotiated a five year agreement retaining his law firm, Cardin and Cardin, P.A., as counsel to Old Court at an annual retainer of $40,000 plus hours billed in excess of that amount. The sale agreement also provided for the firm of Cardin and Cardin, P.A., to perform legal services in connection with Old Court loan closings ("the loan closing agreement"). In exchange for those legal services, Cardin and Cardin, P.A., or its designee would receive 50% of the closing fees charged by attorneys handling Old Court's loan settlements.

MSSIC approved the sale agreement in its entirety. The loan closing agreement, however, did not operate as it had been represented to MSSIC. The role of Cardin and Cardin, P.A. in loan closings progressively diminished over time; by the summer of 1984 the law firm was providing no legal services whatsoever in connection with Old Court's loan closings. Cardin testified that the loan closing agreement degenerated to a "fee splitting agreement" in that Cardin & Cardin, P.A., continued to receive 50% of all fees generated by Old Court in connection with loan closings even after that law firm ceased to perform the legal services contemplated by the loan closing agreement. Old Court borrowers

were not informed that Cardin, who performed no legal services in connection with their loans, received 50% of the closing fees collected at Old Court loan settlements.

Jeffrey Levitt paid Cardin & Cardin, P.A. its "settlement fees" under the fee splitting agreement from his personal expense account at Union Trust Co. Bank. Between December 1983 and May 1985, Levitt wrote twelve checks, in the total amount of $1,040,000.00, to Cardin pursuant to the fee splitting agreement.

As early as the summer of 1983, attorneys at Cardin & Cardin, including Jerome Cardin's son, Sanford, became concerned that the fee splitting agreement might violate the Code of Professional Responsibility's prohibition against unethical fee splitting.[2] Cardin testified that in the fall of 1983, in response to this concern, he and Levitt entered into two agreements retaining Cardin & Cardin, P.A., as general counsel for Levitt and for Charles Street Title, Inc. (one of Levitt's companies), respectively.

Each agreement provided for Cardin & Cardin, P.A., to receive $6,000.00 per month. Cardin testified that the legal services to be performed consisted of being "available to furnish general legal advice as requested by Jeffrey Levitt on the one hand and Charles Street Title on the other." The monthly retainer fees were increased to $7,000, then to $8,000, and finally to $9,000 per month.

Cardin explained that he would deduct from the amounts owed pursuant to the fee splitting agreement the amounts received pursuant to the Levitt and Charles Street Title retainers. The fees received pursuant to the Levitt and

---

**2.** Disciplinary Rule 2–107 provides,
[Section] A: A lawyer shall not divide a fee for legal services with another lawyer who is not a partner or associate of his law firm or law office unless, one, the client consents to employment of the other lawyer after full disclosure that a division of fees will be made; two, the division is made in proportion to the services performed and responsibility assumed by each; three, the total fees of the lawyers does not clearly exceed reasonable compensation for legal services they rendered the client.

Charles Street Title retainers brought Cardin's total Old Court earnings far above the $1,040,000 received from Levitt pursuant to the fee splitting agreement.

Meanwhile, between the 1982 sale of Old Court and its collapse in 1985, Cardin continued to be involved in Old Court's management. Cardin, Levitt and Pearlstein attempted to meet at least weekly to discuss Old Court's current and future business. Cardin and Levitt joined in a number of business and real estate ventures financed through Old Court. On at least two occasions, Cardin sent memos to Levitt, warning Levitt of "the importance of Old Court's strict compliance with all regulations" and preaching that "no matter how big one is, it is imperative that he comply with the letter of the law" and that "perception is more important than fact." Prophetically, Cardin attached to one of his warning memos a 14 November 1984 *Wall Street Journal* article concerning the indictment of a former bank chief executive officer on 44 counts of bank fraud.

From the fall of 1982 through May 1985, when Old Court collapsed and was placed into conservatorship by the state, Cardin & Cardin, P.A., received $1.3 million for "legal services" rendered to Old Court over and above the $1,040,000 it received pursuant to the fee splitting agreement. In addition to those sums, Cardin was paid a total of $385,000 in five separate transactions, for which he was indicted and convicted in this case.

The five counts of theft were as follows:

*Count I:* Count I charged Cardin with stealing $100,000 in connection with a project known as "Bloody Point." The state produced evidence from which the jury found that, in October and November of 1984, two real estate developers obtained a $6.5 million loan from Old Court Savings and Loan to purchase and eventually develop property known as Bloody Point. The loan proceeds in excess of the purchase price were placed in escrow to be withdrawn as needed. Cardin admittedly had no involvement whatsoever with

Bloody Point; nevertheless he submitted to Jeffrey Levitt an invoice on the letterhead of Cargol Consultants, Inc. ("Cargol") for "services rendered" in the amount of $100,000.00. Cargol, a shell corporation formed and controlled by Cardin, had rendered no services. At the time of settlement, Levitt drew a check to Cargol for $100,000.00 as part of the distribution of the $6.5 million loan proceeds. The jury convicted Cardin of theft of the $100,000.00, which would otherwise have remained in escrow at Old Court for use by the developers. In so doing, the jury rejected Cardin's defense that the $100,000.00 actually represented his rightful share of the closing fees and that Cargol was merely the "designated payee" pursuant to the fee splitting agreement.

*Counts II and III:* Counts II and III concerned two checks, each for $75,000, which Cardin received in February of 1985. One check was drawn on the account of Old Court Joint Venture (OCJV), the other on the account of Old Court Investment Corporation, Inc. (OCIC). Both OCJV and OCIC were wholly owned subsidiaries of Old Court. Cardin had submitted to OCJV and to OCIC invoices on Cargol letterhead, in the amount of $75,000 each, for services rendered. At trial, Cardin admitted that Cargol rendered no services for OCIC or OCJV, and that the invoices were "inaccurate." In convicting Cardin of theft in connection with each of those transactions, the jury rejected Cardin's defense that the two $75,000 payments were actually "bonuses" representing Cardin's rightful 18% share of Old Court's recent profits. Cardin admitted that he knew that Old Court's Board of Directors never approved such a distribution of profits, and he also conceded that under Maryland Code Ann. Financial Institutions article § 9–328 (1986 Repl. Vol.), a saving and loan's board of directors must approve the distribution of any profits. It is interesting to note that Cardin testified that he served on the committee that promulgated the current Financial Institutions Code.

*Count IV:* Count IV involved a project known as "Galleria Enterprises of Maryland" (Galleria). Galleria's owners

borrowed $300,000 from Old Court and deposited the money into an account opened in Galleria's name. Cardin submitted two invoices to Galleria on May 1, 1984, and July 18, 1984, on his personal stationery. Each of those invoices requested payment "for consultation services" in the amount of $25,000. Admitting that no services were performed for Galleria and that the invoices were "inaccurate," Cardin claimed the $50,000 paid from the Galleria escrow account at Old Court represented closing fees rightfully due him pursuant to the fee splitting agreement. The State, however, produced evidence that the checks were not drawn on Levitt's personal account as was the regular practice pursuant to the fee-splitting agreement. The jury convicted Cardin of stealing $50,000 of Galleria's money.

*Count V:* Count V involved one payment to Cardin of $85,000 by check drawn on an Old Court account in the name of "Variety Services, Inc." Unlike the other sums for which Cardin was convicted, this payment was not made pursuant to a false invoice. The check, however, bore the notation "legal consult." Cardin testified that he had never heard of Variety Services, Inc. and that he performed no legal services for Variety. The State presented considerable evidence that tended to prove that by the time Cardin received the $85,000 payment in May 1985, he knew that the money he received had been stolen by Levitt. Cardin asserted that the $85,000 payment represented payment due him pursuant to the fee splitting agreement with Levitt and Pearlstein, but the check was not drawn on Levitt's personal account at Union Trust as had been Levitt's usual method of dispersing payments due pursuant to the fee splitting agreement. It was the State's theory that Cardin was guilty of theft because he knew he was receiving stolen money. The jury apparently accepted that theory; it convicted Cardin of theft of the $85,000.

### Appellant's Contentions

With regard to the jury instructions, Cardin claims the following instructions were erroneous:

-that the jury need not agree on which form of theft was committed;

-that any conduct by the defendant related to his receipt and handling of money which was likely to mislead or conceal was relevant to the question of intent;

-that if the jury found Cardin had engaged in fee splitting which violated Disciplinary Rule 2–107, that fact could be considered in deciding whether the defendant had criminal intent in receiving the funds alleged to be stolen;

-that under Maryland law, dividends can be declared only on an annual basis.

Cardin also asserts the trial judge erred in refusing to instruct the jury on the *definitions* of his "claim of right" and "honest belief" defenses, and in refusing to instruct the jury that "evidence of good character ... 'is not proof of innocence although it may be sufficient to raise a doubt of guilt.' "

With regard to the evidence produced at trial, Cardin complains that the State failed to prove the essential elements of "obtaining or exerting unauthorized control over the property of another" and "theft by deception," two of the types of theft prohibited under Maryland's comprehensive theft statute.

Finally, with regard to the conduct of the trial itself, Cardin claims that the trial court impermissibly limited the scope of *voir dire,* erred in refusing to dismiss a juror for cause, impermissibly cross-examined Cardin and impermissibly permitted the State to present an inflammatory closing argument.

We shall address each of those contentions in turn.

## I

■ In instructing the jury, the trial judge said, *inter alia:*

"All that is required is that all members of you, the jury, are convinced beyond a reasonable doubt that all

elements of one or more forms of theft have been proven."

Cardin contends that this instruction was erroneous because, under Maryland's consolidated theft statute, Md. Code Ann. art. 27, § 342 (1957, 1982 Repl. Vol.), the jury must unanimously agree upon which *form* of theft was committed in order to convict.

Cardin's contention is without merit. As we recently stated in *Craddock v. State*, 64 Md.App. 269, 494 A.2d 971, *cert. denied*, 304 Md. 297, 498 A.2d 1184 (1985):

> Article 27, Sec. 342 sets forth five different factual situations which, if proved, constitute the crime of theft. The categories are:
>
> (a) Obtaining or exerting unauthorized control over property of the owner.
>
> (b) Obtaining control over property of the owner by deception.
>
> (c) Possessing stolen personal property knowing that it has been stolen, or knowing that it probably has been stolen.
>
> (d) Obtaining control over the property of another knowing that it is lost or mislaid property.
>
> (e) Obtaining the services of another by deception, or knowing that the services are provided without the consent of the person providing them.

Clearly, the gravamen of the offense of theft is the depriving of the owner of his rightful possession of his property. The particular method employed by the wrongdoer is not material; "an accusation of theft may be proved by evidence that it was committed in any manner that would be theft under this subheading...." Art. 27, Sec. 341; *Whitehead v. State*, 54 Md.App. 428 at 442, 458 A.2d 905 (1983). *See Jones v. State*, 303 Md. 323, 493 A.2d 1062 (1985).

Generally, jurors are not required to uniformly accept all of the evidence presented in order to arrive at a unanimous verdict. Some jurors unquestionably reject

evidence that others accept in determining guilt or innocence. In short, the law requires unanimity only in the verdict, not in the rationale upon which the verdict is based. In the case *sub judice,* the statute sets forth various acts that constitute the crime of theft. As long as jurors unanimously agree that theft in some form was committed, nothing more is required.

*Id.* at 277–78, 494 A.2d 971.

Even more recently, the Court of Appeals had occasion to address the same issue in a slightly different context. In *Rice v. State,* 311 Md. 116, 532 A.2d 1357 (1987), the evidence would have supported a conviction of theft under either subsection (a) of art. 27, § 342, *"Obtaining or exerting unauthorized control,"* or subsection (c), *"Possession of stolen property."* The appellant contended that the trial judge erred in refusing to grant an instruction to the effect that, in order to convict, the jury must be unanimously agreed on all elements of at least one subsection of the statute. Rejecting that contention, the Court held that the unanimity sought by appellant is not constitutionally required because subsection (a) and subsection (c) "are not autonomous offenses but rather one crime defined two ways." 311 Md. at 136, 532 A.2d 1357.

## II

The court also instructed the jury as follows:

"Any conduct by a defendant related to his receipt and handling of money which was likely to mislead or conceal is relevant to the question of intent."

"You have heard evidence that certain conduct of the defendant may be unethical fee splitting in violation of Disciplinary Rule 2–107 of the Maryland Code of Professional Responsibility for attorneys. . . .

"A violation of Disciplinary Rule 2–107 is not a crime in and of itself. However, if you conclude that the defendant's conduct violated Disciplinary Rule 2–107, you may consider that evidence as relevant to the defendant's intent, the defendant's good character or lack thereof, the

defendant's knowledge of the conduct of Jeffrey Levitt when the defendant received funds from Mr. Levitt, and whether the defendant had a good faith honest belief that he was entitled to the monies he received."

Cardin argues that the two instructions quoted above were erroneous because they were "grossly prejudicial" and because they were "unprecedented" under Maryland law. We do not agree, and find that the trial judge correctly instructed the jury.

■ Cardin's defense to each charge of theft was that he entertained a good faith belief that he was entitled to the money. The challenged instructions addressed the jury's determination of Cardin's state of mind, and, as Lord Bowen noted in *Edgington v. Fitzmaurice,* 29 Ch.D. 459, 483 (1885), the state of a man's mind is as much a matter of fact as the state of his digestion. In *Weaver v. State,* 226 Md. 431, 174 A.2d 76 (1961), the Court of Appeals stated:

The state of one's mind or *scienter* is a question of fact. *Putinski v. State, supra* [223 Md. 1, 161 A.2d 117 (1960) ]; *Tufts v. Poore,* 219 Md. 1, 147 A.2d 717. And being subjective in nature, proof of wrongful intent is seldom direct, but is usually inferred from proven circumstances. *Felkner v. State,* 218 Md. 300, 146 A.2d 424.

*Id.* at 434, 174 A.2d 76 *(quoted in Caldwell v. State,* 26 Md.App. 94, 108, 337 A.2d 476 (1975)). In *Caldwell, supra,* we further explained that "[t]he 'proven circumstances' for which an accused's state of mind or intent can be inferred are his acts, conduct and words." *Id.* at 108, 337 A.2d 476 (citations omitted); *see also Taylor v. State,* 238 Md. 424, 433, 209 A.2d 595 (1965). Prior crimes or bad acts may be considered by the jury in their determination of a defendant's intent. *Tinnen v. State,* 67 Md.App. 93, 98, 506 A.2d 656 (1986). "Moreover, 'other crimes' evidence may be admitted when several crimes are so connected in time or circumstances that one cannot be fully shown without proving the other." *Id.* at 98, 506 A.2d 656 (citations omitted).

We feel that the instructions with regard to Cardin's "receipt and handling of money" were correct. Cardin testified that he arranged for Cargol to receive funds which were actually paid to him. Cardin testified that he formed and utilized Cargol, a shell corporation, purely for tax purposes. Cardin claimed that his use of Cargol evidenced his good faith, honest belief defense that he had the right to exert control over the funds received as he did. The State, on the other hand, contended that Cardin's use of Cargol's name in submitting false invoices evidenced Cardin's intent to deceive bank regulators and to launder funds he knowingly stole from Old Court's depositors. In view of the conflicting inferences as to Cardin's intent or state of mind in submitting bills and receiving money through Cargol, the court's instruction concerning Cardin's "receipt and handling of money" was proper. Cardin was free to argue, as he did, that his use of Cargol as a conduit was not intended to and did not mislead or conceal; the State, in turn, was free to interpret Cardin's use of Cargol as proof of criminal intent. *Hayette v. State*, 199 Md. 140, 145, 85 A.2d 790 (1952).

We also believe that the court's instruction with regard to the possible Disciplinary Code violation was correct and warranted by the evidence. Cardin himself stated that he engaged in a fee-splitting arrangement with the other Old Court owners. Cardin also testified that his associates at Cardin & Cardin, P.A., expressed their concern that the fee-splitting arrangement violated the disciplinary rules, but subsequently researched the problem and concluded that the fee-splitting agreement did not amount to a violation. Cardin claimed that the fee splitting agreement, and his belief that the practice was ethical, evidenced his good faith claim of right to the funds he was accused of stealing in Counts I, IV and V.

Cardin requested an instruction that "[u]nder certain circumstances fee splitting may violate the lawyer's professional code, but it is not a violation of law and not a criminal act." The given instruction—"A violation of Disciplinary

Rule 2–107 is not a crime in and of itself"—fairly covered the instructions requested. The remainder of the instruction was also correct. Cardin introduced evidence of the fee-splitting agreement and its possible violation of the disciplinary rule as evidence of his "good faith claim of right" defense, *i.e.*, his belief that he was entitled to the money paid to him. It was entirely proper for the jury to consider whether a fee splitting arrangement that would violate the canons of ethics governing Cardin's profession was consistent with a bona fide belief that he was entitled to the money.

In *United States v. Reamer*, 589 F.2d 769 (4th Cir.1978), in a criminal trial for mail fraud arising from charges of operating a scheme to defraud insurance companies, the Fourth Circuit Court of Appeals affirmed the lower court's instruction that if the jury concluded that the defendant violated a disciplinary rule in connection with the scheme to defraud insurance companies, the jury could consider such violation in their determination of defendant's intent to engage in mail fraud. *Id.* at 771. In *United States v. Klauber*, 611 F.2d 512 (4th Cir.1979), in a criminal trial for mail fraud and racketeering, the Fourth Circuit Court of Appeals approved the following instructions:

> The Government has introduced evidence which it claims shows that the defendant paid individuals known as runners and MTA bus drivers moneys in exchange for those individuals referring to him clients who had been injured in automobile and bus accidents. The use of such individuals is relevant in this case if you find that the procurement of clients by such persons was part of the scheme as alleged in the indictment.

> The law of the State of Maryland prohibits an attorney from compensating or agreeing to compensate another person for procuring clients. Furthermore, the Code of Professional Responsibility which applies to attorneys practicing in the State of Maryland provides in part as follows:

A lawyer should not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client. Likewise, a lawyer shall not accept employment when he knows or it is obvious that the person who seeks his service does so as a result of conduct described herein.

If you should find that as a part of a scheme to defraud, the defendant paid certain individuals for the purpose of procuring as clients persons who had been involved in automobile and bus accidents, and if you should further find that the defendant knew or should have known that such payments were violations of Maryland law or violations of the Code of Professional Responsibility applicable to Maryland lawyers, then you may consider such violation as evidence of the intent with which the defendant acted in this case.

The Maryland Court of Appeals found it necessary to analyze those instructions in the disciplinary proceedings that followed Klauber's conviction, in order to determine whether the crime of mail fraud was necessarily one involving moral turpitude. The Court concluded that it was not. *Attorney Grievance Commission v. Klauber*, 283 Md. 597, 598–99, 391 A.2d 849 (1978). Concurring with that result, Judge Gilbert specifically criticized the *Klauber* instruction as follows:

Plainly, the hiring of "runners," while a clear violation of the Canons of Professional Responsibility, Md. Rule 1230, is not a crime involving moral turpitude. *Under that charge, if the jury believed the government's case was weak, they may well have considered the employment of "runners" as evidence of fraudulent intent and thereby bootstrapped the government's case to a strength it otherwise would not possess.* Of course, I do not know that this is what happened, but as the majority makes clear, it *could* have happened, and that is enough to preclude a finding that "the crimes of which ...

[Klauber] was convicted plainly involved moral turpitude." *Attorney Grievance Commission v. Reamer*, 281 Md. [323] at 328 [379 A.2d 171 (1977) ].

I cannot, with any degree of reasonable certainty, state that the portion of the District Court judge's charge dealing with the "runners" had no effect on the jury's verdict.

*Id.* at 602, 391 A.2d 849 (Gilbert, J., specially assigned, concurring) (emphasis added). In view of the concern expressed by Judge Gilbert in *Klauber,* we specifically limit our holding to the facts of this case—where the defendant introduces evidence of possible Disciplinary Code violations as evidence of a good faith or honest belief defense, whether a violation in fact occurred is relevant to the jury's determination of the defendant's intent or lack thereof. The instructions therefore were correct.

■ Appellant also contends that it was error for the trial judge to instruct the jury that:

"[A]t all times relevant to the issues in this case, Section 9–328 of the Financial Institutions Article of the Annotated Code of Maryland provides: 'The Board of Directors of any savings and loan association shall allocate the profits of the association, at least annually, at the times the by-laws provide.' "

In Counts II and III, Cardin claimed that the $75,000 payments from OCJV and OCIC to Cargol represented payment from Old Court to Cardin of profits to which Cardin was entitled as an owner of Old Court. Cardin's knowledge of the above-quoted statute was admitted into evidence without objection; indeed, Cardin testified that he served on the committee that drafted § 9–328.

Cardin asserts that the instruction was erroneous because "§ 9–328 governs the allocation of accumulated profits to reserve accounts (which must be done annually)—a pure accounting function." That contention is without merit. Section 9–328 identifies who must authorize payments of profits, a key issue in determining whether Cardin believed

he had a legitimate right to exercise control over the $150,000 in Counts II and III, and whether he in fact honestly believed he was entitled to his share of Old Court's profits in the form of payments from OCJV and OCIC. Inclusion of a pertinent statute in the trial court's advisory instruction is of course proper. *Dillon v. State,* 27 Md.App. 579, 588, 342 A.2d 677 (1975), *aff'd,* 277 Md. 571, 357 A.2d 360 (1976); *Parker v. State,* 7 Md.App. 167, 184–86, 254 A.2d 381 (1969), *cert. denied, Parker v. Maryland,* 402 U.S. 984, 29 L.Ed.2d 150, 91 S.Ct. 1670 (1971). There was no error here.

### III

Evidence of good character ... "is not proof of innocence although it may be sufficient to raise a doubt of guilt."

■ Cardin claims that under *Hennessy v. State,* 37 Md.App. 559, 378 A.2d 205, *cert. denied,* 281 Md. 738 (1977), he was entitled to the above-quoted instruction. We do not agree.

We did state in *Hennessy* that the above-quoted instructions were "as far as we will go." *Id.* at 566, 378 A.2d 205. Relying on that statement, Cardin requested the above instruction, but the trial judge denied the request and instead instructed the jury as follows:

The defendant has introduced evidence as to his good character in the community wherein he resides. The defendant has a right to do this in order to show that his character is such that it would make it unlikely that he would commit a crime such as the one with which he is charged. The prosecution may attempt to impeach the reputation of the defendant by offering evidence to rebut it or to show acts inconsistent with the character trait asserted by the defendant.

You should consider that evidence along with all the other evidence in this case in determining the guilt or innocence of the defendant.

We believe the gist of the instruction Cardin requested was fully covered in the instructions eventually given. The judge stated that character evidence may be presented to show that it is "... unlikely that [the defendant] would commit a crime such as the one with which he is charged." The phrase "unlikely that he would commit" conveys basically the same idea as "raise a doubt of guilt," since a determination that it is *unlikely* that the defendant committed the crime necessarily means that there is a *reasonable doubt* that the defendant is guilty as charged. It is clearly the law in Maryland that "[t]he court need not grant a requested instruction if the matter is fairly covered by instructions actually given." Md. Rule 4–325(c). *See, Lansdowne v. State,* 287 Md. 232, 239, 412 A.2d 88 (1980); *King v. State,* 36 Md.App. 124, 136, 373 A.2d 292, *cert. denied,* 281 Md. 740 (1977). Since the instructions actually given fairly covered the instructions requested, the trial judge did not abuse his discretion in refusing Cardin's requested character instruction.

### IV

■ The trial judge refused to give instructions requested by Cardin defining two statutory defenses: "good faith claim of right," Md.Ann.Code art. 27, § 343(c)(1) (1982 Repl. Vol.), and "honest belief," Md.Ann.Code art. 27, § 343(c)(2) (1982 Repl. Vol.). Instead of giving the instruction submitted by Cardin, the trial judge instructed the jury on these defenses by reading verbatim the language of art. 27, § 343(c). We believe that was sufficient; the statutory language was not so technical or complicated as to confuse the jury, but instead was quite straightforward and lucid. It is well-established that "[w]hen the meaning of a charge is implicit and clear, definitive terms are discretionary." *Dillon v. State, supra,* 27 Md.App. at 586, 342 A.2d 677; *White v. State,* 23 Md.App. 151, 164, 326 A.2d 219 (1974), *cert. denied,* 273 Md. 723 (1975). Hence, the trial judge was clearly within his discretion when he refused to define the requested terms.

V

Cardin claims that, under the theft statute, the evidence presented at trial was insufficient to convict him of "obtaining or exerting unauthorized control," art. 27, § 342(a),[3] or of "obtaining control by deception," art. 27, § 342(b).[4] With regard to the "unauthorized control" charge, Cardin claims that the State failed to prove that he exercised unauthorized control over the funds in question "because the evidence showed that in each instance at issue, the person who controlled the funds—Jeffrey Levitt—freely and voluntarily transmitted title *and* possession to Cardin." With regard to the "theft by deception" charge, Cardin claims that the State failed to prove "that the victim relied on a false representation to his detriment." Both arguments are without merit.

In *Lane v. State*, 60 Md.App. 412, 483 A.2d 369 (1984), *cert. denied*, 302 Md. 570, 489 A.2d 1129 (1985), we outlined the standard of appellate review of a claim that evidence produced at trial was insufficient to sustain a conviction under Maryland's theft statute:

---

3. Md.Ann.Code art. 27, § 342(a) provides:
 (a) *Obtaining or exerting unauthorized control.*—A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and
 (1) Has the purpose of depriving the owner of the property; or
 (2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or
 (3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

4. Md.Ann.Code, art. 27, § 342(b) (1957, 1984 Repl.Vol.) provides:
 (b) *Obtaining control by deception.*—A person commits the offense of theft when he willfully or knowingly uses deception to obtain and does obtain control over property of the owner, and;
 (1) Has the purpose of depriving the owner of the property; or
 (2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or
 (3) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

Appellant's conviction must be affirmed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830 (1980). The legislature revised the theft laws in 1979 in order to create a "single consolidated offense designated as 'theft'. . . . The purpose of this revision [was] to eliminate [the] technical and absurd distinctions that have plagued the larceny related offenses and produced a plethora of special provisions." *Joint Subcommittee on Theft Related Offenses, Revision of Maryland Theft Laws and Bad Check Laws*, p. 2 (October, 1978). Under the new law "[c]onduct designated as theft ... constitutes a single crime embracing, among others, the separate crimes heretofore known as larceny, larceny by trick, larceny after trust, embezzlement, false pretenses, shoplifting and receiving stolen property." Md.Ann.Code 1957, art. 27, § 341 (1982 Repl. Vol.). . . . If the evidence against appellant was sufficient to prove theft under *any* subsection of § 342, the court may affirm.

*Id.* at 419–20, 483 A.2d 369 [citations omitted, second emphasis added].

■ Appellant does not claim on appeal that the evidence was insufficient for the jury to convict him of theft by receipt of stolen property, which the State also accused Cardin of committing. The State informed Cardin in its statement of particulars that in each count Cardin was charged with committing theft in violation of art. 27, § 342(a), (b) *or* (c). Because Cardin does not claim that the evidence was insufficient under subsection (c) of § 342,[5] we will affirm. *Lane v. State, supra*, at 420, 483 A.2d 369.

---

5. Md.Code Ann., art. 27, § 342(c) (1957, 1984 Repl.Vol.) provides:

We note that theft by "unauthorized control" (subsection (a)), theft by "deception" (subsection (b)), and theft by "posession of stolen property" (subsection (c)) are all included in the § 342 prohibition of theft in any form and by any means. Because the "unauthorized control" subsection "... makes no distinction concerning the way the property was obtained, it could be used to prosecute instances of 'receiving stolen property.'" *Joint Subcommittee on Theft Related Offenses, Theft and Bad Check Laws,* p. 35 (1979). The sufficiency of the evidence to support Cardin's conviction under art. 27, § 342(c) has not been challenged, and if the evidence was sufficient to convict him under that subsection, it was sufficient to convict him under subsection (a) as well.

■ Finally, we do not interpret Maryland's consolidated theft statute as requiring detrimental reliance as an element of the crime. Both the plain language of the statute and its legislative history conclusively demonstrate that detrimental reliance on the part of the victim is not an element of theft by deception.

The language of the statute is neither obscure nor ambiguous. Article 27, § 342(b) provides: "A person commits the offense of theft when he willfully or knowingly uses deception to obtain and does obtain control of the property of the owner...." [Emphasis added.] "Deception" is defined in art. 27, § 340(b)(1) as follows: "[c]reate or confirm in another an impression which is false and which the *offender* does not believe to be true...." [Emphasis added.]

---

(c) *Possession of stolen property.*—(1) A person commits the offense of theft if he possesses stolen personal property knowing that it has been stolen, or believing that it has probably been stolen, and:
(i) Has the purpose of depriving the owner of the property; or
(ii) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or
(iii) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

There is nothing in the language of the statute that would require the State to prove that the victim relied to his detriment on any false representation. The plain meaning of the statute is reinforced by the fact that definition of "deception" requires only that the false statement and representation be known to be false by the "offender." The statute, therefore, requires proof of the offender's intent to mislead, not proof that the victim was misled.

The legislative history of § 342(b) confirms that the legislature purposely omitted detrimental reliance as an element of theft by deception. Maryland's theft law was enacted through a two-step process. The General Assembly originally proposed a consolidated theft statute in 1978 as Chapter 840 of the Laws of Maryland, but provided for a one-year delay in the enactment of the statute to permit comment and suggestions to improve the legislation. *See, Report of Joint Subcommittee on Theft Related Offenses, Revision of Maryland's Theft Laws and Bad Check Laws* (1979) at 2–3.

As initially adopted in 1978, § 342(b) provided: "A person commits the offense of theft when he wilfully or knowingly *obtains by deception* control over property of the owner." 1978 Md. Laws. Ch. 849, § 1. In response to a request for comments on the proposed statute, the Maryland Attorney General's Office suggested in a letter dated February 15, 1979, that the phrase "obtains by deception" be changed to "uses deception to obtain." The articulated purpose for this change was to eliminate any requirement, suggested by the phrase "obtains by deception," that the victim rely to his detriment, because "the defendant's criminality should not depend on what the victim is thinking." The State also wished "to give the statute the flexibility necessary to tackle sophisticated white collar prosecutions."

The Joint Subcommittee on Theft Related Offenses prepared a revised statute for consideration by the General Assembly, specifically incorporating the change in § 342(b) suggested by the Attorney General. The Joint Subcommittee clarified the statute expressly to ensure that reliance by

the victim was not an element of the offense. It is explained:

 4. "Theft by deception"—Language was clarified to provide that the deception used by the thief need not be successful in misleading the "victim." It is only necessary that some form of deception be used and that the property be obtained. Therefore, if deception is used by a thief in dealing with an "undercover" agent and the agent is not deceived, but the property is obtained, the theft by deception will have been committed.

Excerpt from Ch. 687, Laws of Md. 1979, S.B. 1058, Amendments to Chapter 849 of 1978 (Revision of Theft and Bad Check Laws), Explanation of Amendments.

Thus, the General Assembly adopted the Attorney General's suggestion and specifically amended the statute to eliminate any possible inference that reliance was an element of theft by deception by deleting the language "obtains by deception" and substituting "uses deception to obtain and does obtain." The intent of the legislature being readily apparent not only from the very words of the statute but also its legislative history, we reject Cardin's claim that detrimental reliance is an element of theft by deception under the statute.

## VI

Cardin assigns several points of error to the trial judge's conduct during the trial itself. We will examine each contention in turn.

### A. *Voir dire*

Cardin claims that the trial judge unduly restricted the scope of *voir dire.* In particular, Cardin claims the trial court erred when it refused to permit specific questions concerning biases toward lawyers, bank practices, income tax practices and wealth. We disagree.

█ It is clearly the law that "[t]he purpose of the *voir dire* examination is to ascertain the existence of cause for disqualification and for no other reason." *Bremer v. State,*

18 Md.App. 291, 321, 307 A.2d 503 (1973), *cert. denied, Bremer v. Maryland,* 415 U.S. 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974) (citing *Borman v. State,* 1 Md.App. 276, 279, 229 A.2d 440 (1967)). The specific questions to be asked on *voir dire* lie within the sound discretion of the trial judge. *Bremer v. State, supra,* [18 Md.App.] at 321, 307 A.2d 503; *Rodgers v. State,* 4 Md.App. 407, 411, 243 A.2d 28 (1968), *cert. denied,* 252 Md. 732 (1969); *Culver v. State,* 1 Md.App. 406, 417, 230 A.2d 361 (1967). The questions asked on *voir dire* must go to a specific issue of eligibility; the court may in its discretion refuse those questions which are speculative "or in the nature of a fishing expedition." *Phenious v. State,* 11 Md.App. 385, 389, 274 A.2d 658, *cert. denied,* 262 Md. 748 (1971) (*quoted in Bremer v. State, supra* [18 Md.App.] at 321, 307 A.2d 503).

 Cardin asked the court to question prospective jurors regarding their attitudes toward lawyers, bank practices, income tax practices and wealth. The judge declined to pose those questions to the jury. Cardin's counsel noted an exception to the denial, stating:

> ... there is going to be evidence in this case that Mr. Cardin was wealthy and he's also a lawyer, and ... [the] questions ... [are] designed to find out if people had backgrounds in those areas for the purpose of assisting us in even exercising pre-emptories which we also think is an important aspect of *voir dire.*

The questions posed by Cardin and declined by the trial court were clearly designed to aid Cardin's attorneys in making peremptory challenges, not to disclose such bias as would justify dismissal of a juror for cause. The court was fully within its discretion in denying those questions. Our review of the record discloses that the trial court afforded Cardin exhaustive *voir dire.* Each juror was questioned out of the presence of the rest of the panel. This occurred over a three-day period and produced in excess of 450 pages of transcript. We are persuaded that every effort was made to ensure that each juror was free of bias.

## B. *Dismissal of a Juror for Cause*

▆▆ Cardin claims that the trial judge erred when, during *voir dire,* he refused to dismiss for cause a juror whose friends were Old Court depositors. This contention is entirely without merit. It is well established that "[a] juror may be struck for cause only where he or she displays a predisposition against innocence or guilt because of some bias extrinsic to the evidence to be presented." *McCree v. State,* 33 Md.App. 82, 98, 363 A.2d 647 (1976), citing *Johnson v. State,* 9 Md.App. 143, 149, 262 A.2d 792 (1970). The juror in this case displayed no such predisposition. She testified during *voir dire* that she had not discussed Old Court with her friends who were depositors, that she could "keep an open mind," *and* that she knew one of the character witnesses for Cardin. There is no evidence that the juror at issue was biased, or that the judge abused his discretion in denying Cardin's request for disqualification.

## C. *The Closing Argument*

▆▆ Cardin claims that the State's closing argument was inflammatory and improper. We disagree; the State's closing argument was in fact quite restrained.

Cardin points to the following statements made during the State's closing argument:

It is an old saying. Whether you are rich or poor, it is nice to have money. *The more you have the more you want.* That saying applies in this case.

. . . . .

Jerome Cardin is not the first person of wealth to steal. Unfortunately, he probably won't be the last.

. . . . .

Essentially, the defendant would like you to believe he is not the type of person who would steal.... Can you tell by the way a person looks whether he would steal? Can you tell by the way he dresses? ... *We all know it isn't the inner city kids with sweat shirts that steal but from*

*time to time, people in white collars,* fancy clothes do so because greed knows no class.

We see nothing inflammatory about those statements. They were clearly within the allowable scope of the State's argument.

To be sure, we have on occasion held that closing statements made by the State amounted to reversible error. In *Killie v. State,* 14 Md.App. 465, 287 A.2d 310 (1972), we held it was prejudicial for the State to refer to the defendant's homosexuality for the first time in closing argument, where appellant's sexual preferences were totally irrelevant and likely to prejudice the jury. In *Conway v. State,* 7 Md.App. 400, 256 A.2d 178 (1969), we held that the State committed reversible error when it disclosed appellant's prior conviction of assault with intent to rape during its closing argument in appellant's trial for rape. *See also Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962) (reversible error for the State on closing argument to urge the jurors to resolve all doubts in favor of the State because even if they made a mistake no great harm would be done since the defendant might soon be paroled).

Despite such rare instances of reversal for prosecutorial error, it is still well established that:

> While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions. *See* 53 Am.Jur. *Trial* § 453 (1956).

*Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707 (1974). What appellant complains of was well within the permissible bounds of advocacy.

### D. *The Court's Examination of Cardin*

Cardin testified in his own defense; he was the last witness at his trial. He was on the witness stand for two days and his testimony produced 398 pages of transcript. Following the State' cross-examination, the court undertook to question Cardin. The court's questions and Cardin's responses are contained in 10 pages of trial transcript, and one document was entered into evidence. Following this examination, the trial judge commented that "[the] court understands its obligation to sharpen issues and seek the truth whenever it can...." Cardin claims the court's cross-examination of him amounted to reversible error. We disagree.

It is the law in Maryland that "[t]he questioning of the trial judge showing his disbelief of the witness' testimony [is] beyond the line of impartiality over which a judge must not step." *Vandegrift v. State,* 237 Md. 305, 311, 206 A.2d 250 (1965). In *Vandegrift,* the Court of Appeals held that it was error for a trial judge to question a witness repeatedly on the same matter and to remind the witness that he was under oath and subject to penalties for perjury. Such behavior by the trial judge "amounted to a manifestation of his disbelief of the witness, which we must presume influenced the jury, whose function it was as the triers of facts to determine the credibility of the witnesses." *Id.* at 310, 206 A.2d 250. Because the trial judge improperly influenced the jury, the *Vandegrift* Court was "forced to conclude that the manner of the questioning by the trial judge amounted to ... prejudicial error." *Id.* at 310, 206 A.2d 250.

In *Brown v. State,* 220 Md. 29, 150 A.2d 895 (1959), the Court of Appeals stated that the trial judge's questioning of the defendant, which "indicate[d] sarcastically, so that the jury could not have failed to understand, that the judge did

not believe the story the defendant was telling," was "clearly improper." *Id.* at 39, 150 A.2d 895. And in *Marshall v. State*, 291 Md. 205, 434 A.2d 555 (1981), the Court of Appeals held that the trial court committed reversible error where it warned the defendant, out of the presence of the jury, of the penalties of perjury. The *Marshall* Court stated: "a defendant in every case, whether it is a jury trial or not, is entitled to an impartial judge. A defendant is plainly denied this right when the judge's participation in the trial stifles the defendant's ability to freely present all of the competent evidence available." *Id.* at 214, 434 A.2d 555.

We recently had the opportunity to address the limits of permissible interrogation of witnesses by a trial judge in *Smith v. State*, 66 Md.App. 603, 505 A.2d 564, *cert. denied*, 306 Md. 371, 509 A.2d 134 (1986). In *Smith*, we found the late Judge Lowe's observations in *Bell v. State*, 48 Md.App. 669, 429 A.2d 300 (1981), to be particularly enlightening:

The trial judge's role is that of an impartial arbitrator and that appearance is not generally compatible with an inquisitorial role. It is the better practice for a trial judge to inject himself as little as possible in a jury case, *United States v. Green*, 429 F.2d 754, 760 (D.C.Cir.1970), because of the inordinate influence that may emanate from his position if jurors interpret his questions as indicative of his opinion. *See, also, Patterson [v. State ]*, 275 Md. 563, 578–80 [342 A.2d 660] (1975). The appearance that a judge may have abandoned his role as an impartial arbitrator, is especially hazardous when cross-questioning a defendant.

Yet, if counsel have faltered in their advocacies, it is not improper for a trial judge to be "meticulously careful to make sure that the full facts [are] brought out," *Jefferies v. State*, 5 Md.App. 630, 632 [248 A.2d 807] (1969), or to seek to discover the truth when counsel have not elicited some material fact, or indeed when a witness has not testified with entire frankness. Annot., 84 A.L.R. 1172, 1193 (1933). Such questioning may even bear upon

the credibility of a defendant in a proper circumstance. *Madison v. State,* 200 Md. 1, 12 [87 A.2d 593] (1952); *King v. State,* 14 Md.App. 385, 393–94 [287 A.2d 52] *cert. denied,* 265 Md. 740 (1972). This should be achieved expeditiously, however, if at all, for a protracted examination has a tendency to convey to a jury a judge's opinion as to facts or the credibility of witnesses.

*Smith v. State, supra* [66 Md.App.], at 618–19, 505 A.2d 564 (quoting *Bell v. State, supra* [48 Md.App.], at 678, 429 A.2d 300).

 Whether a trial judge's interrogation of a witness or party has in fact conveyed to the jury the judge's opinion as to the facts or the credibility of the witness must be determined by all the facts and circumstances attending the questions posed by the trial judge in each particular case. What would be an innocuous question in one circumstance could be highly prejudicial in another. In many instances, much will depend upon the judge's tone of voice, facial expression, or other factors that cannot be assessed by reviewing a cold printed record devoid of expression or inflection. We must make our determination on the basis of the language of the questions alone. On that basis, in this case we are not persuaded that the trial judge crossed that fine line between "sharpening the issues" and conveying an impression of doubt as to the witness's credibility.

Initially, the trial judge questioned Cardin regarding the legal differences between solo practice and practice in a firm or professional association. Cardin explained these differences and gave a brief history of his firm, Cardin & Cardin, P.A. The court then asked Cardin: "When you practiced law, did you practice law in your name individually or as a member of Cardin & Cardin, P.A.?" Cardin responded as follows: "I can't answer that question, sir. I practiced law as Jerome Cardin." In response to further questioning, Cardin revealed that the sale of Old Court to Levitt and Pearlstein was a "private sale."

The trial judge then asked Mr. Cardin to review several defense exhibits. At the trial court's request, Cardin explained that the exhibits were retainer agreements which retained the firm of Cardin & Cardin, P.A., and further explained that payments received pursuant to the retainers "went into the firm."

The trial judge then asked Cardin whether monies due pursuant to the fee splitting agreement would rightfully go to the firm. Cardin explained that, pursuant to the fee splitting agreement, all payments due "would be the firm's, ours or anyone we would direct it to...." Cardin read the applicable portion of the fee splitting agreement to the judge: " 'Furthermore, I understand that the work to be performed by each of us under the agreement may be performed by Jeffrey A. Levitt, Cardin & Cardin, P.A. or the designee of either ... and the fees will be collected and paid accordingly.' " The trial judge asked if Cardin had ever executed a document designating the payee of the fee splitting agreement to be someone other than the firm of Cardin & Cardin, P.A., and Cardin responded in the negative.

The court then questioned Cardin concerning a document which was not in evidence but which had been produced in an unrelated civil case before another judge. That document had no relevance to the criminal charges against Cardin; it was a letter from Jonathan Greenstein to Jeffrey Levitt and Allan Pearlstein relating to Levitt's and Pearlstein's payments on notes executed in connection with their purchase of Old Court. The trial judge asked why the letter apparently directed Levitt and Pearlstein to make their payments to Cardin's firm, and Cardin testified that "Cardin & Cardin, P.A. was acting as an escrow [agent] for these funds and we were getting money from Levitt and Mr. Pearlstein and were distributing the amounts owed to each." The trial judge did not pursue his questioning further, and the Greenstein letter was not admitted in evidence.

 The form and language of the questions themselves do not indicate any error or abuse of judicial discretion. The judge's questions of Cardin followed a long trial on complicated issues involving charges of complex white collar crimes. It was within the judge's discretion to elicit for the benefit of the jury the basic differences between an incorporated law firm and a solo practice, particularly with respect to billing and receiving fees, even if it had the effect of pointing out discrepancies in Cardin's testimony. Certainly, Cardin was given an adequate chance to respond, and his attorney also had an opportunity to ask him questions and elicit additional exculpatory explanations from him.

In summary, the court's interrogation of Cardin does not on its face reveal any display of partiality in the judge. The judge in this case, unlike the judge in *Vandegrift*, did not warn the witness, in front of the jury, of the penalties of perjury; and unlike the trial judge in *Brown*, he did not use words that tended to display sarcasm or a disbelief of the witness's testimony.

Cardin's brief, through a liberal use of italics, implies that the trial judge indicated to the jury his disbelief of Cardin by emphasizing certain words and phrases. Cardin also stresses the fact that when defense counsel objected to the "accusatory tone" of the court's questions, that characterization was not disputed by the judge or the State's Attorney. The situation, however, did not demand a verbal response, and the trial judge implicitly rejected appellant's assessment of his conduct in denying appellant's motion for a mistrial. Neither the italics in the brief nor the form of the objection persuades us that the characterization of the judge's tone as "accusatory" was correct. As we pointed out, *supra*, we cannot look beyond the words themselves. Moreover, in the course of instructing the jury, the trial judge emphasized that any comments he had made or questions he had asked during the course of the trial should not be taken as any indication of the court's belief as to the truth of the evidence or the weight to be given it. Such

instruction would tend to negate any possible misinterpretation of the court's questioning of Cardin. As we recently stated in *Brooks v. State*, 68 Md.App. 604, 613, 515 A.2d 225 (1986), "... when curative instructions are given, it is presumed that the jury can and will follow them. *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968); *Wilson v. State*, 261 Md. 551, 570, 276 A.2d 214 (1971)."

■ Appellant also assigns prejudicial error to the fact that the trial court questioned him regarding a document which was not admitted into evidence. We agree that it was improper for the court to do so; however, the letter was not relevant to the proceedings at hand, and since the trial judge ceased all questions after giving Cardin an opportunity to explain the letter to the jury, we believe the letter and the questions and answers concerning it were so innocuous that they could have played no material part in the results of the case. The error, therefore, was harmless beyond a reasonable doubt. *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.