807 P.2d 241

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Idell STEPHENS, Defendant–Appellant.**

**No. 12328.**

Court of Appeals of New Mexico.

Feb. 12, 1991.

**544**

Eric D. Dixon, Portales, for defendant-appellant.

Tom Udall, Atty. Gen., Margaret McLean, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

HARTZ, Judge.

The district court, in a non-jury trial, found defendant guilty of using a telephone to terrify, intimidate, threaten, harass, annoy or offend. NMSA 1978, § 30–20–12 (Repl.Pamp.1984). We reverse because the evidence of guilt was insufficient.

## I. FACTS

We view the evidence in the light most favorable to the state, resolving all conflicts and indulging all permissible inferences in favor of the verdict. *See State v. Sutphin,* 107 N.M. 126, 753 P.2d 1314 (1988).

On the morning of March 22, 1989, defendant called Mrs. Gloria Trujillo at work. The receptionist told defendant that Mrs. Trujillo was with a client and offered to take a message. Defendant stated that she needed to talk to Mrs. Trujillo right then, that the call related to her son. At the time, defendant's granddaughter, Lori, was living with Mrs. Trujillo's son, Martin.

Lori was sixteen years old. Martin is approximately six years older than Lori.

Mrs. Trujillo was reluctant to talk to defendant. She thought the conversation would upset her and it would interrupt her interview of a client. Nevertheless, she accepted the call, fearing something was wrong with her son. Defendant's first words were: "Don't hang up. This has been going on for too long and I need to talk to you about Martin and Lori." Mrs. Trujillo told defendant she could not talk to her and hung up.

About two minutes after the first call, defendant called back. She told the receptionist that she did not appreciate Mrs. Trujillo's telling her that she had a client and then hanging up on her. She asked the receptionist to take a message for Mrs. Trujillo. The substance of the message was that defendant was going to call the attorney general and let him know what had been going on unless Mrs. Trujillo returned her call. Defendant said that Mrs. Trujillo, her husband, and Martin would lose their jobs after she spoke to the attorney general.

Mrs. Trujillo made a report to the Lovington Police Department after work the same day. The officer taking the statement testified that Mrs. Trujillo was upset while giving the statement, and cried afterwards. According to Mrs. Trujillo's testimony, defendant had been upsetting the family with telephone calls and the call of March 22 was the breaking point. She said that defendant had been calling her house and her husband's place of employment. The subject of the conversations was always Lori and Martin.

The frequency of the calls was not clearly established at trial. Although Mrs. Trujillo testified that defendant "called me all the time," her response to the prosecutor's request for the specific number of occasions on which she personally had spoken to defendant was "two or three times, at least." On cross-examination she was asked, "Is it two times or three times that [defendant] had called you before this?" She answered: "Two or three times, it's hard to remember. I know I've answered

the call several times and she would ask for my husband." In her own testimony defendant indicated that she had spoken with the Trujillos three or four times.

Also unclear was what Mr. or Mrs. Trujillo had told defendant during the prior conversations. On direct examination Mrs. Trujillo said that she hung up on defendant during one prior conversation. Her only other testimony on the subject was as follows:

Q: Did you ever voice to her your wish to not talk to her?

A: Yes, I felt like I did. I hung up on her. I told her—when she called the office, I told her. I made it quite clear.

There was no testimony concerning the timing of the prior calls. Defendant testified that Lori and Martin began living together shortly before Labor Day in 1988, so presumably the calls were limited to the six-month period from then until March 22, 1989.

Defendant testified that she had been Lori's primary custodian since birth and was very concerned about Lori's living arrangement. According to her account, while Lori was living with Martin, Lori had become involved with alcohol and drugs and had attempted suicide twice. Defendant said that she had made several unsuccessful attempts to have law enforcement agencies intervene.

## II. DISCUSSION

Section 30–20–12(A) and (B) state:

A. *It shall be unlawful for any person, with intent to terrify, intimidate, threaten, harass, annoy or offend, to telephone another and* use any obscene, lewd or profane language or suggest any lewd, criminal or lascivious act, or *threaten to inflict injury or physical harm to the person or property of any person. It shall also be unlawful for any person* to attempt by telephone to extort money or other thing of value from any other person, or to otherwise disturb by repeated anonymous telephone calls the peace, quiet or right of privacy of any other person at the place

where the telephone call or calls were received, or *to maliciously make a telephone call, whether or not conversation ensues, with intent to annoy or disturb another,* or to disrupt the telecommunications of another.

B. The use of obscene, lewd or profane language or the making of a threat or statement as set forth in Subsection A shall be prima facie evidence of intent to terrify, intimidate, threaten, harass, annoy or offend. [Emphasis added.]

We have emphasized the pertinent portions of the statute, which relate to (1) threatening calls and (2) "maliciously annoying" calls. We consider the second provision first. That discussion leads naturally to consideration of the first provision.

### A. *Maliciously Annoying Calls*

In *State v. Gattis,* 105 N.M. 194, 730 P.2d 497 (Ct.App.1986), we construed the "maliciously annoying" language. The defendant in that case raised the contention that the statute was unconstitutionally overbroad in that it would prohibit constitutionally protected expression. We wrote:

*People v. Klick*[, 66 Ill.2d 269, 5 Ill. Dec. 858, 362 N.E.2d 329 (1977) ] held that the Illinois statute criminalized conduct protected by the first amendment, *i.e.,* the right to communicate to another in a reasonable manner. *Id.,* [5 Ill.Dec. at 860], 362 N.E.2d at 331. Examples of reasonable communications that the court believed were prohibited by the statute include a call made by a customer to express dissatisfaction with a product or service, a call by an irate citizen to a public official, or a call by an individual bickering over family matters. The New Mexico statute requires that a call made with the intent to annoy or disturb must be made maliciously. This excludes valid calls of the type described in *People v. Klick* even if they are intended to cause minor annoyance, since "maliciously" is defined as the intentional doing of a harmful act *without just cause or excuse,* or in utter disregard of the consequences. *Potomac Insurance Co. v. Torres,* 75 N.M. 129, 401 P.2d 308 (1965).

*Id.,* 105 N.M. at 198–99, 730 P.2d at 501–02 (emphasis in original). Thus, we have construed Section 30–20–12 so as not to prohibit "the right to communicate to another in a reasonable manner," including reasonable calls by customers to express dissatisfaction, by irate citizens to public officials, and by individuals bickering over family matters. This construction rests not only on first amendment considerations but also on a presumption of the legislature's "unwillingness to criminalize the normal risks of unpleasant human intercourse[, such as those] emanating from neighborhood feuds, romantic rumbles, family fall-outs, and small-town-type political bickerings or enmities." *State v. Patterson,* 534 S.W.2d 847, 850 (Mo.Ct.App.1976).

■ The purpose of defendant's calls is undisputed: she was seeking assistance from the parents of her granddaughter's boyfriend to try to terminate what she saw as an unhealthy relationship. That purpose was a legitimate one. *Cf.* NMSA 1978, § 30–9–11(D) (Cum.Supp.1990) (defining criminal sexual penetration in the fourth degree—which makes it a fourth-degree felony for a person older than twenty to cause a sixteen-year-old person to engage in sexual intercourse). A call made for such a purpose by a close relative is, even though annoying to the receiver, one that ordinarily is with just cause and excuse. When a caller has a legitimate purpose and the call communicates that purpose, only in an extreme circumstance is the call inexcusable. Such a circumstance can be created by a variety of factors. One factor would be the language employed in the call. Because this factor is specifically addressed in the first sentence of § 30–20–12(A), we discuss it separately in the next portion of the opinion. Other factors could be the frequency of calls, the time of day of the call, or the strength and frequency of the recipient's objections to such calls.

In this case the state's evidence relating to such factors fails to establish beyond a reasonable doubt that the March 22 calls were inexcusable. Although at some point repeated calling becomes inexcusable and could form the basis of a prosecution under Section 30–20–12, *see, e.g., People v. Smith,* 89 Misc.2d 789, 392 N.Y.S.2d 968, *cert. denied,* 434 U.S. 920, 98 S.Ct. 393, 54 L.Ed.2d 276 (1977), we need not decide when that point has been reached, because in this case the evidence regarding prior calls is so vague. In particular, there was no evidence concerning the timing of earlier calls by defendant to Mr. and Mrs. Trujillo, except that presumably they began less than six months before the phone calls that formed the basis of the charge. In that context, Mrs. Trujillo's testimony that she had spoken to defendant at least two or three times before and that she had, on some unspecified occasion, hung up on defendant, is inadequate to prove that defendant's calls on March 22 were wholly unjustified. Section 30–20–12 does not require that on a matter of such obvious importance and concern, one must take no for an answer and never call again. We emphasize that evidence of the effect on the recipient of the calls cannot substitute for evidence of the defendant's misconduct. *Cf. Jones v. Municipality of Anchorage,* 754 P.2d 275 (Alaska Ct.App.1988) (unlawfulness does not turn on subjective reaction of person called); *Caldwell v. State,* 26 Md.App. 94, 337 A.2d 476 (1975) (cannot prove caller's intent by evidence of effect on victim).

■ Nor does defendant's calling back the second time on March 22 constitute a violation. Mrs. Trujillo testified that during the first conversation, "I told her I couldn't talk to her, I didn't want to, and I just hung up." Defendant's first words to the receptionist on the second call were that she did not appreciate Mrs. Trujillo's telling her that she had a client and then hanging up. Given the receptionist's earlier statement to defendant that she should leave a message because Mrs. Trujillo was with a client, it was not unreasonable for defendant to call back to leave a message.

The remaining factor that could establish that defendant's second call was inexcusable is the language employed. Defendant conveyed a threat in the message she left with the receptionist. As noted above, an examination of this issue requires us to

turn to the first sentence of Section 30–20–12(A).

### B. *Threatening Calls*

The first sentence of Section 30–20–12(A) explicitly covers threats conveyed by telephone. We conclude that the legislature did not intend that the later portion of the statute relating to malicious calls should duplicate that coverage. Just as a specific statute prevails over a general statute governing the same conduct, *see State v. Riley,* 82 N.M. 235, 478 P.2d 563 (Ct.App.1970), a distinct provision of a statute specifically addressing certain conduct should prevail over a more general provision that could be read to govern the same conduct. Thus, when a threat is the sole basis for finding that a call with an otherwise proper purpose is inexcusable, then the first sentence of Section 30–20–12(A) controls.

The question here is the meaning of "threaten" in the first sentence of Section 30–20–12(A). In rendering its verdict, the district court relied on the threat defendant expressed to the receptionist.

The statutory language cannot be read to include everything that might be termed a "threat." For example, we have no doubt that the statute would unconstitutionally inhibit free speech if "threat" were construed to include every threat to file suit. The United States Court of Appeals for the Fourth Circuit stated that the word "threatening" in a similar statute was unconstitutionally overbroad, at least absent a narrowing construction. *Walker v. Dillard,* 523 F.2d 3, 5 n. 7 (4th Cir.), *cert. denied,* 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975). We think it reasonable to presume that the legislature was concerned only with threats of wrongful injury to person or property. Therefore, we construe "threats" under the statute to include, at most, threats of criminal or tortious misconduct. Because the record in this case is devoid of evidence that defendant would be committing a crime or a tort by going to the attorney general, we hold that the conviction cannot be upheld on the basis of defendant's "threat."

### III. CONCLUSION

For the above reasons, we reverse defendant's conviction.

IT IS SO ORDERED.

BIVINS and CHAVEZ, JJ., concur.