# JAMES CALDWELL *v.* STATE OF MARYLAND

[No. 749, September Term, 1974.]

*Decided May 6, 1975.*

The cause was argued before MORTON, THOMPSON and POWERS, JJ.

*Philip W. Moore* for appellant.

*Donald R. Stutman, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General* and *J. Owen Wise, State's Attorney for Caroline County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

James Caldwell, appellant, was tried and convicted by the Circuit Court for Caroline County, at a court trial, of unlawfully making use of telephone facilities for repeated calls, with intent to annoy, abuse, torment, harass or embarrass one Geraldine Breeding. Md. Code, Art. 27, § 555A. We reverse the conviction due to the insufficiency of the evidence to show a specific intent to annoy as required by the statute.

## I FACTS

At approximately 10 a.m. on January 16, 1974, the complaining witness, Geraldine Breeding, received a telephone call at her place of employment, the Caroline Nursing Home. Due to the importance of the contents of that call we quote in full Mrs. Breeding's testimony in that regard:

> "Q. And what was the substance of that conversation?
>
> A. Well, it was a gentleman caller and he was calling to try to pick me up. In other words, he was saying that he would like to meet up with me and that he would meet up with me or talk to me before the day was over and he gave me all the information about hisself and I thought it was a joke. I thought it was somebody playing a prank on me and I was just . . . I just kept talking to him to try to find out who it was and he wouldn't give me his name. All he would say was 'It was Jim.'
>
> Q. And how long did this conversation take, would you say?

A. Well, I kept on talking. I couldn't get rid of him. He kept talking and we had a new admission that came in at approximately eleven o'clock and then I did hang up, because the new admission I had to admit.

\* \* \* \*

A. He told me that he lived near Denton in a new home. That he was a painter. That he had a yellow Grand Prix. A bronze colored El Camino and a van that he used for work. That his wife worked in Denton. That he had a twelve (12) year old daughter and . . . . let's see . . . . He said that he had seen me many times on the street in Denton, but that I wouldn't pay a second glance in his direction and he kept saying 'You are not listening to me.'

\* \* \* \*

He wouldn't tell me who it was. He said that if I knew who it was that I would probably wouldn't want anything to do with him and he just kept talking and talking and it was really very disturbing and upsetting because I didn't know who I was talking to.

\* \* \* \*

Q. What other information, if any, did the caller give that indicated he knew your habits and whereabouts?

A. Well he said that he knew that I had a green Oldsmobile and that he had . . . he knew that I worked out at the nursing home because he had asked his employees. One of his employees knew me and he had asked his employee who I was and where I worked; and he also told me that he had been by my house many times. He knew exactly where I lived and he had been by there and looked it over many times, which upset me quite a bit.

\* \* \* \*

He said he could not find my phone number in the book because he did not know my husband's name . . .

* * * *

He said he had asked one of his employee's who I was and where I worked so that he could get in touch with me.

* * * *

A. Okay. I said 'Hello', and he said 'Hello, Gerri.' And I said 'Yes.' And he said 'You will probably think I am a nut.' And then he kept on and he said that he had been wanting to call me and he had found out all of the information about me from one of his employees.

* * * *

A. As to where I worked and my name and where I lived and then I asked him what was the call . . . what was it about . . . why was he calling me and this was when he said that he had wanted to meet up with me and see what would become then. And then he gave me all of this information about hisself.

* * * *

A. Not until I kept asking. After two or three times who it was and he then said his name was Jim and I said 'Jim who?' and he would not give me his last name because he said if I knew who it was that I would not talk with him anymore and I told him that I did not particularly care to talk to anybody that I did not know anyway and he kept right on talking and saying that he would either meet with me or call me again before my quitting time.

* * * *

A. Other than that he just kept saying that he

wanted to meet up with me and I asked him if he was having troubles with his wife or something. Why would he call me? Why would he pick on me and he said he didn't usually make a practice of this, which I found out later was wrong."

During the course of this first call another employee at the home, Wanda Clark Lane, listened in to the conversation at Mrs. Breeding's request. Mrs. Lane testified as to the contents of the first call as follows:

"Q. What was the purpose of the caller calling Mrs. Breeding as far as you were able to determine?

A. He stressed that he wanted to meet her and get better aquainted.

Q. How long did you listen in on the phone conversation?

A. A . . . probably half hour, because we had a new admission at that time and Mrs. Breeding told him she had to hang up because the patient was admitted or was there to be admitted.

Q. Did he indicate any . . . . or did the caller indicate any other, reveal any other information about himself during the remainder of this conversation?

A. He told her that he . . . she had seen him, but in a town like this she wouldn't take a second notice.

Q. Did Mrs. Breeding say anything to the caller that you recall?

A. She kept saying, this is a joke, my husband put you up to it.

\* \* \* \*

A. Mrs. Breeding asked him was he having problems with his family . . . with his wife, and he said 'No, he couldn't really say that he was having problems.' That he had admired her for some time and wanted to get better acquainted.

Q. Do you think that he meant that?

> A. Well, he sounded like it.
>
> Q. He did?
>
> A. (Nodded head)"

This first conversation lasted between 45 minutes and an hour. Mrs. Breeding testified that she was very upset by the call because she did not know the true intention of the caller.

At approximately 1:30 on the same day, a man with a briefcase, identified at trial as appellant by Mrs. Breeding, walked into the Caroline Nursing Home, smiled at her and left. Approximately 20 minutes later, she received another call about which she testified as follows:

> "Q. Now was there any relationship or similarity between the voice of the second call and the one from the first call?
>
> A. Oh yes. Definitely. And he . . . .
>
> Q. Was it the same voice?
>
> A. And he said his name over again. He said 'This is Jim.'
>
> Q. Well did the caller indicate whether . . . at two o'clock or thereabouts whether or not he was the same one who had called at ten?
>
> A. Yes he did. And he said that he had . . . that I couldn't say that I had not seen him before, because I had just looked him in the face not more than fifteen minutes before that.
>
> Q. Now did the caller on the second call give you any additional information other than that which he disclosed at the ten o'clock call?
>
> A. No. The only thing was he kept telling me to say that he was colored. He kept saying 'Say it. Say it.' Because he . . . that was what he meant in the first one I guess . . . in the first conversation . . . was he kept saying 'You are not listening to me.'
>
> Q. Now how long did the second conversation take?
>
> A. About ten (10) minutes.

Q. Now you said that the caller said you could
not say you hadn't seen him because you had just
looked him in the eye some few minutes before
that?

A. Yes sir.

* * * *

A. He said that this . . . He said 'This is Jim' and
he said 'I thought that I had better call you and tell
you that I will not be able to be there later because I
have an unexpected trip out of town, and that I just
wanted you to know that you can't say that you
haven't seen me because you just looked me in the
face not more than fifteen minutes ago.' And I said
'Do you mean you have been in the home?' and he
said 'Yes.' I said 'Are you here now?' and he said
'No.', and that was it. I told him I did not want him
to call me ever again. I didn't care who he was and I
didn't want anything to do with him."

As a result of the specific information given by the caller,
Lynn Clark, a part-time receptionist at the home and
daughter of Wanda Clark Lane, after speaking with some
friends at school the following day, theorized that the caller
was appellant, James Caldwell. This theory was developed
because several years earlier appellant had on several
occasions called Miss Clark to ask her out and that at one
time he had spoken with her on the street.

Acting on Miss Clark's theory, one call was made to
appellant's home at approximately 4:15 p.m. on January 17,
1974 by Mrs. Lane. The person who answered was asked if
he was James Caldwell. The person answered yes. Mrs. Lane
testified that she recognized the voice as that of appellant
because he had called her home several years before asking
to speak to her daughter, Lynn Clark. Mrs. Lane made
another call to appellant's residence between 4:15 and 5 p.m.
Mrs. Breeding testified that she listened in on the first call
along with Lynn Clark, that Mrs. Lane asked the person who
answered "to whom am I speaking with?" and that he said
"James Caldwell." From this Mrs. Breeding stated that the

voice was the same as the voice of the person who made the two calls the day before.

Appellant denied making the two calls on the 16th. He admitted receiving a call late in the afternoon of the 17th, going to the police station immediately after the call to complain and riding past the Caroline Nursing Home on his way home. He also produced alibi testimony from his wife and a business associate.

## II CONSTITUTIONALITY OF ARTICLE 27, SECTION 555A

Section 555A of Article 27 of the Maryland Code provides as follows:

> "It is unlawful for any person to make use of telephone facilities or equipment (1) for an anonymous call or calls if in a manner reasonably to be expected to annoy, abuse, torment, harass, or embarrass one or more persons; (2) for repeated calls, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons; or (3) for any comment, request, suggestion or proposal which is obscene, lewd, lascivious, filthy, or indecent. Any person violating any one of the provisions of this section is guilty of a misdemeanor, and upon conviction thereof, shall be subject to a fine of not more than $500.00 or to imprisonment for not more than three (3) years, or both, in the discretion of the court. (1961, ch. 165; 1970, ch. 669.)"

Appellant was charged and convicted under clause (2) of that section. He claims that that clause is unconstitutional. In essence he argues that clause (2) is vague and indefinite in that it does not provide a comprehensible standard of criminality against which a person can gauge his actions and it allows the crime to be defined by the sensitivities of the victim. This condition he claims is a denial of his right to due process under the 14th amendment to the United States Constitution and Article 23, Maryland Declaration of Rights.

The requirement that a criminal statute must fairly warn citizens which of their actions are criminal is a fundamental tenet of American jurisprudence. The Supreme Court has expressed this concept in a number of ways:

> "Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the state commands or forbids.' *Lanzetta v. New Jersey*, 306 U. S. 451, 453, 59 S. Ct. 618, 619, 83 L. Ed. 888." *Papachristou v. City of Jacksonville*, 405 U. S. 156, 162, 92 S. Ct. 839, 31 L.Ed.2d 110 (1972).

> "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey, supra* at 453.

> "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law· and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Construction Co.*, 269 U. S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926).

The difficulty of determining whether certain marginal cases are within the meaning of a challenged penal statute's language, however, does not automatically render that statute unconstitutional for vagueness. *Robinson v. United States*, 324 U. S. 282, 285, 286, 65 S. Ct. 666, 89 L. Ed. 944 (1945). In that regard, the Supreme Court stated in *United States v. Petrillo*, 332 U. S. 1, 7, 67 S. Ct. 1538, 91 L.Ed.2d 1877 (1947):

> "The Constitution has erected procedural safe-guards to protect against conviction for crime

except for violation of laws which have clearly defined conduct thereafter to be punished; *but the Constitution does not require impossible standards.*" Emphasis added).

As a logical outgrowth of the above summarized "vagueness doctrine", the Supreme Court has long recognized that a statute which might otherwise have been unconstitutionally vague can be saved constitutionally when it requires that the actor have a specific intent. In *Screws v. United States*, 325 U. S. 91, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945), the Court stated at 101-102:

> "The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning. *See United States v. L. Cohen Grocery Co., supra.* But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."

The concept was reiterated in *Boyce Motor Lines, Inc. v. United States*, 342 U. S. 337, 342, 72 S. Ct. 329, 96 L. Ed. 367 (1952):

> "The statute punishes only those who knowingly violate the Regulation. This requirement of the

presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid."

This rule was recently reaffirmed in *Papachristou v. City of Jacksonville,* 405 U. S. 156, 92 S. Ct. 839, 31 L.Ed.2d 110 (1972). There the Court struck down a vagrancy ordinance on vagueness grounds. The Court added however that the lack of a specific intent requirement in the statute weighed heavily in its decision. It stated, "Nor are they [the citizens of Jacksonville] protected from being caught in the vagrancy net by the necessity of having a specific intent to commit an unlawful act." *Papachristou v. United States, supra* at 163.

The rationale behind the specific intent "exception" to the vagueness doctrine is easily understood and was succinctly stated in Note, *Unwanted Telephone Calls — A Legal Remedy,* 1967 Utah L. Rev. 379, 388-389 n. 52 (1967):

"The reasoning is that a person already bent on serious wrongdoing has less need for notice and that a citizen who refrains from acting with morally bad intent is not endangered by the statutory sanction. Note, Due Process Requirements of Definiteness in Statutes, 62 Harv. L. Rev. 77, 85 (1948)."

The portion of Article 27, § 555A under attack in the case at bar provides that:

"It is unlawful for any person to make use of telephone facilities or equipment . . . (2) for repeated calls, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons;"

The statute obviously requires the state to prove that an accused had the specific intent to annoy, abuse, torment, harass or embarrass the person who receives the calls. This holding is in conformity with decisions in other jurisdictions.

In *United States v. Darsey*, 342 F. Supp. 311 (E.D. Pa. 1972) the Court was faced with the problem of interpreting a section of the U.S. Code (Title 47, Section 223 (1) (d)) which provides that, "Whoever — (1) in the District of Columbia or in interstate or foreign communications by means of telephone — (D) makes repeated telephone calls . . . solely to harass any person at the called number; . . ." could be imprisoned for up to six months and fined not more than $500. After stating that § 223 (1) (D) was passed to deal with the problem which arises when repeated calls are made with the intent to harass even though the conversation is not of an obscene nature and even though the caller is not anonymous, the Court went on to discuss the requirements the section imposed on the prosecution and found that the specific intent to harass was necessary to support a conviction under the section. *See State v. Goode*, 118 Ohio 479, 195 N.E.2d 581 (1962), appeal dismissed 174 Ohio St. 232, 188 N.E.2d 421.

In enacting clause (2) of Section 555A of Article 27, the Maryland legislature has followed a course identical in most respects with that followed by Congress in enacting § 223 (1) (D). It has provided punishment for a person, whether anonymous or known, who makes repeated calls to another with the specific intent to harass, annoy, torment, abuse or embarrass that person. By requiring such specific intent the legislature has sufficiently delineated in a constitutional sense, what is criminal conduct under the statute so that the citizens of Maryland need not engage in a guessing game as to their criminal liability under Section 555A. The statute is therefore not unconstitutionally vague.

The cases relied upon by appellant are inapposite. In *Coates v. City of Cincinnati*, 402 U. S. 611, 91 S. Ct. 1686, 29 L.Ed.2d 214 (1971) the Court struck down a local ordinance which made it a crime for three or more persons to gather on a public sidewalk and conduct themselves "in a manner annoying to persons passing by . . . ". The Court found the ordinance to be unconstitutionally vague because it subjected the exercise of the right of assembly to an unascertainable standard in that the definition of the crime

was left entirely to the sensitivities of the "victim." [1] In *Coates*, the ordinance did not require specific intent. In *Ashton v. Kentucky*, 384 U. S. 195, 86 S. Ct. 1407, 16 L.Ed.2d 469 (1966), the Court struck down a criminal libel conviction because it was "based on a common law concept of the most general and undefined nature," *i.e.:* disturbing the peace. The Court emphasized the extremely nebulous nature of the phrase "breach of the peace." In *Papachristou v. City of Jacksonville, supra*, the Court struck down a vagrancy ordinance which did not require specific intent. As discussed above the Court in *Papachristou* indicated that if the ordinance had required specific intent it could have passed constitutional muster. In *Gooding v. Wilson*, 405 U. S. 518, 92 S. Ct. 1103, 31 L.Ed.2d 408 (1972), the Court struck down on vagueness grounds a Georgia statute which provided that any "person who shall, without provocation, use to or of another, and in his presence . . . opprobrious words or obscene language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor . . .". The Court based its decision on the fact that the Georgia courts had not narrowed the application of the statute to "fighting words." In *Gooding*, unlike the case at bar, the statute did not require specific intent. *Gregory v. City of Chicago*, 394 U. S. 111, 89 S. Ct. 946, 22 L.Ed.2d 134 (1969) is completely inapposite. In *Gregory*, the defendants were arrested for refusing to disperse their demonstration upon request by the police. They were charged and convicted however for holding the demonstration. The Supreme Court reversed because there was no evidence that the defendants' actions were anything but orderly and thus they were constitutionally protected from interference.

### III SUFFICIENCY OF THE EVIDENCE

Appellant next contends that the evidence was insufficient to sustain his conviction. Under Md. Rule 1086 we review the

---

1. The Court also found the ordinance unconstitutionally overbroad because it authorized the punishment of constitutionally protected conduct, *i.e.:* freedom of assembly.

case upon both the law and the evidence and the judgment of the trial judge will not be set aside on the evidence unless clearly erroneous, due regard being given to the trial judge's opportunity to evaluate the credibility of the witnesses. We conclude that the judgment of the trial court was clearly erroneous for two distinct reasons and we therefore reverse appellant's conviction.

In the first portion of this opinion, we held that clause (2) of Article 27, § 555A requires the state to prove that the actor had the specific intent to annoy, harass, embarrass, torment or abuse the person or persons who received the calls. Thus specific intent to annoy etc., along with the fact that the calls are "repeated" and, of course, the criminal agency of the accused are the elements of the crime. The trial court, however, refused to take the element of the specific intent to annoy, etc. into consideration in his finding of guilt. At trial, after final arguments of counsel, and after reading all of § 555A, the trial court stated:

"I might say that maybe a jury might find this matter differently from what the Court does, but the Court feels that the State has shown beyond a reasonable doubt that this man is guilty as charged. I don't think from what — the evidence that's been produced here that this lady could have made up the story that she told from the stand, and the way certainly that she told it indicates to the Court from seeing this man on the stand that he was the one who made these proposals and this annoying phone call to this woman. *Now whether or not he made it with intent to harass and annoy her I don't think makes any difference* because I think the effect of it was. There was testimony that she was so disturbed that she had to have the services of a doctor, that she was crying, that the entire Caroline County Nursing Home was placed in a turmoil." (Emphasis added).

We have already shown the appellant's intent cannot be

fully shown by the effect upon the victim. As the trial court has failed to take into consideration an essential element of a crime charged, his judgment was clearly erroneous. *Pachmayr v. State*, 1 Md. App. 270, 229 A. 2d 434 (1967).

We reverse also because the evidence presented by the State and the inferences fairly deducible from the evidence, are insufficient to show beyond a reasonable doubt that the appellant had the requisite specific intent to annoy, etc. Mrs. Breeding.

Direct proof of an accused's intent is difficult. The Court of Appeals expressed the problem in *Weaver v. State*, 226 Md. 431, 174 A. 2d 76 (1961):

> "The state of one's mind or *scienter* is a question of fact. *Putinski v. State, supra; Tufts v. Poore*, 219 Md. 1, 147 A. 2d 717. And being subjective in nature, proof of wrongful intent is seldom direct, but is usually inferred from proven circumstances. *Felkner v. State*, 218 Md. 300, 146 A. 2d 424." *Id.* at 434.

The "proven circumstances" from which an accused's state of mind or intent can be inferred are his acts, conduct and words. *Taylor v. State*, 238 Md. 424, 433, 209 A. 2d 595 (1965); *Bird v. State*, 231 Md. 432, 190 A. 2d 804 (1963); *Perez v. State*, 7 Md. App. 452, 455, 256 A. 2d 369 (1969), *cert. denied*, 256 Md. 747. The inference must as always be reasonable. *Davis v. State*, 204 Md. 44, 102 A. 2d 816 (1954); *Perez v. State, supra.*

The Maryland courts have not as yet been called upon to determine the sufficiency of evidence of specific intent in cases under Art. 27, § 555A.[2] Our search of other jurisdictions has shown a similar paucity of decisions in this regard.

In *State v. Goode, supra*, the Court, after preliminarily

---

2. In Nichols v. State, 5 Md. App. 340, 247 A. 2d 722 (1968), *cert. denied* 253 Md. 735, this Court reversed a conviction under § 555A because the state failed to prove anonymity, repeated calls or obscene language. In Nichols the appellant had been charged generally with violating the whole of § 555A.

holding that the intent of the caller was an express element of the crime charged, held that there was sufficient evidence of such intent to sustain defendant's conviction under an Ohio statute similar to clause (2) of § 555A. The evidence there disclosed that the complaining witness had been receiving calls every night for six months; that the number of calls on each day varied from two to thirty-seven; that the calls were made between midnight and 6:30 a.m.; that on one particular day the defendant called at approximately 1:30 a.m. and told the complaining witness that he "had better not go to work on the following morning, that he [defendant] had purchased a gun with the intention of killing [the complaining witness] and that if [the complaining witness] went to work the next morning he definitely would kill [him] . . ."

In *State v. Murphy,* 176 Ohio St. 385, 199 N.E.2d 884 (1964) the Supreme Court of Ohio reversed a conviction under the same statute where the evidence showed that two calls were made by the defendant and that those calls did not involve a threat of bodily harm or indecent language. The Court held the evidence insufficient to show that the calls were made solely to harass the recipient. In *Shaw v. State,* Tex. Cr. App., 465 S.W.2d 169 (1971) the Court found the evidence sufficient to show an intent to harass. That evidence was summarized by the Court as follows, at 171:

> "The record shows that appellant had called the complaining witness on many occasions over a period of weeks, both at her place of work and at her home. On the night alleged in the information, appellant called the complainant a number of times, beginning early in the evening and continuing until sometime after midnight. Apparently, appellant was trying to locate his estranged wife, whom he believed to be out with the complainant's brother. He told the complainant that he had killed two people and that one more would not make any difference; he then proceeded to describe how he had killed these people."

110

The Court in *Stallworth v. State*, Ala. Cr. App., 296 So. 2d 243 (1974) likewise found the following evidence sufficient to support a conviction for telephone misuse:

> "Mrs. Shirley Carter, the person who received the telephone calls, testified the telephone calls started before Christmas of 1971, and continued about two times a week until September of 1972. According to her, the caller was a male and he would never tell her his name. He asked her all kinds of personal questions and asked her to go out with him. She told her husband each time she got a call. Each time her husband answered the telephone, the caller would not say anything but there would be a pause and the caller would hang up the receiver."

In *State v. Godwin*, 267 N. C. 216, 147 S.E.2d 890 (1966), the complaining witness, Mrs. Wall, had received "disconcerting and frequent" telephone calls from the accused over a three year period and had taken action to stop them without result. In order to show the attitude of the accused toward her, the lower court allowed Mrs. Wall to testify that the accused had attempted to block her car in the parking lot of a local supermarket, that the accused had frequently followed her to such places as the hospital, school, etc. and that the accused would cut her car in front of Mrs. Wall's at least once a week barely avoiding a collision on each occasion. The Supreme Court of North Carolina affirmed Godwin's conviction under a statute similar to § 555A and held that her conduct showed her intent to harass or annoy Mrs. Wall and that it was competent "as interpreting the reasons for her frequent telephone calls."

In the case at bar, our review of the record has disclosed no direct evidence that appellant intended to annoy, etc. Mrs. Breeding by the two phone calls. Nor is there sufficient circumstantial evidence or inferences therefrom to support such a finding.

Mrs. Breeding and Mrs. Lane both testified as to the contents of the first call. Mrs. Breeding alone testified as to the second call. It would be fair to summarize the

conversations as an attempt by appellant to arrange a date with Mrs. Breeding. Appellant began the first conversation by saying "Hello Gerri, . . . you will probably think I am a nut." He then stated that he admired Mrs. Breeding and that he "wanted to meet up with" her and "see what would become" of it. Mrs. Breeding at several junctures in the first conversation asked appellant to identify himself. He told her his name was Jim and then disclosed numerous facts about his family and possessions. Several times Mrs. Breeding stated her belief that the call must have been a joke instigated by her husband. She also asked appellant if he was having problems with his wife. Mrs. Breeding testified that appellant refused to give his last name and stated that if she knew who he was she probably would not talk with him anymore. Mrs. Breeding also told appellant that she did not "particularly care to talk to anybody" she did not know. This conversation lasted about one hour and was terminated by Mrs. Breeding in order to admit a new patient.

Following the first conversation, appellant went to the nursing home where Mrs. Breeding worked, looked directly at her, smiled and left. He called 10 minutes later and said that she couldn't say she didn't know who he was because she had just seen him. During the second conversation, Mrs. Breeding told appellant she did not want him to call her "ever again." No other calls were made by appellant although ample opportunity obviously presented itself. At no time until the end of the second call did Mrs. Breeding directly inform appellant that she did not want to speak with him or that she was upset by his calls. Her statement during the first call that she did not "particularly want to speak with a person who did not give his name" taken in context with her stated belief that the call was a joke instigated by her husband and her query as to whether the appellant was having troubles with his wife does not in our view make the continuing conversation and the second call acts of harassment intended by the appellant.

Nor does the refusal of the appellant to give his full name support a finding of the specific intent to harass, necessary under the statute. Appellant was not charged with making

an anonymous call under clause (1) of Art. 27, § 555A. Anonymity, however, is a factor to be considered in determining intent. *United States v. Darsey, supra* at 313. The term anonymous was defined in *Nichols v. State,* 5 Md. App. 340, 353 n. 5, 247 A. 2d 722 (1968) as "having or giving no name: of a name or with the name unknown or unrevealed." While we need not and do not decide whether appellant's calls were sufficiently "anonymous" to warrant conviction under clause (1) of § 555A, there was one element of anonymity in the calls — the fact that appellant refused to give his last name. This fact is outweighed however by two independent elements: first, the appellant described his family and personal possessions in great detail and; second, the appellant went to the nursing home specifically to be seen by Mrs. Breeding. This is not the typical situation in which the caller to prevent detection gives no information at all. Indeed in the instant case, the appellant gave abundant information about himself — enough in fact to lead to his identification and arrest. Indeed he went to Mrs. Breeding's place of employment and openly displayed himself to her.

We are likewise unpersuaded that the appellant's statement that Mrs. Breeding probably would not talk to him if she knew who he was shows or infers a specific intent to harass her on his part. What it does show is that appellant was not at all sure that Mrs. Breeding would accept his offer of companionship. While the statement shows that the appellant may not have been motivated by the highest ethical or moral ideals, it falls well short of showing that he intended to annoy, harass, etc. Mrs. Breeding.

The testimony of Miss Clark that appellant had called her several years before, relied on by the trial judge in reaching his verdict, is likewise no evidence of an intent to annoy Mrs. Breeding. This is so for the simple reason that there was no evidence whatsoever that appellant intended to harass Miss Clark or that Miss Clark was in fact annoyed or harassed by the calls which appear to have been a futile attempt by appellant to ask Miss Clark out on a date. While the calls may have been relevant to show the identity of the person

who called Mrs. Breeding they were not competent to show appellant's intent in the instant case.

The case at bar does not present a set of facts similar to those found in the cases cited above which dealt with the sufficiency of evidence in telephone misuse situations. In those cases there were numerous calls made over long periods of time. Here there were only two calls made on the same day. In some of those cases there were threats of bodily harm whether implied or expressed. Here there were no such threats either implied or expressed. In most of those cases the calls were made in the early morning hours to the receiver's home when a call of any sort would be more disturbing. Here the calls were made in the middle of the day. Here also there was no evidence independent of the phone calls to in any way show the motivation of appellant. In short the acts and words of appellant in the instant case were not sufficient to raise an inference that he intended to annoy Mrs. Breeding.

We must note that we are convinced that Mrs. Breeding was in fact extremely upset by these two calls, but as we have stated this alone is insufficient to support a finding of specific intent.

*Judgment reversed without a new trial.*

*Costs to be paid by Caroline County.*