776 A.2d 657

**Thomas Paul DEIBLER**

v.

**STATE of Maryland.**

**No. 125, Sept. Term, 2000.**

Court of Appeals of Maryland.

July 17, 2001.

Joseph D. Gallagher (Cynthia A. Raposo of Gill & Sippel, on brief), Rockville, for, for appellant.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

We are all familiar with the legend of Lady Godiva who, in response to a commitment by her husband, Leofric, Earl of Mercia, to repeal onerous taxes levied on the people of Coventry if she dared to ride naked through the town, supposedly did so. Part of that legend, added some 600 years after the event, was that one person in the town, a tailor named Tom, had the temerity to glance upon the noblewoman as she proceeded on her mission and was immediately struck either blind or dead. This probably-mythical tailor became known to history as Peeping Tom.

This case involves another peeping Tom—petitioner Thomas Deibler. Deibler gazed not upon a woman on horseback, but upon a woman taking a shower. By use of a camera with

audio accompaniment that he hid in the bathroom of his friend's home, he surreptitiously spied upon his friend's aunt as she took a shower and otherwise used the bathroom. Unlike Tom the tailor, Deibler was struck neither blind nor dead for his inexcusable breach of common decency. He was, however, convicted in the Circuit Court for Anne Arundel County of violating the Maryland Wiretap Law (Maryland Code, § 10–402(a)(1) of the Courts and Judicial Proceedings Article). For subsequent conduct, he was convicted as well of violating Article 27, § 555A(2) of the Code, which prohibits the making of repeated telephone calls with the intent to annoy or harass.

The issue arising from his conviction for telephone misuse is fact-based and rather straightforward. The question emanating from the wiretap conviction is a legal one we have not previously addressed. Section 10–402(a)(1) makes it unlawful for a person *wilfully* to intercept a wire, oral, or electronic communication.[1] The question is whether willfulness, for purposes of § 10–402(a)(1), requires knowledge on the part of the defendant that his or her action is unlawful—that it is prohibited by the statute. Our answer is that it does not so require.

## BACKGROUND

On June 19, 1999, Deibler was at the home of his friend, Scott Bagdasian, helping Scott and his grandfather prepare the family boat for the summer. Scott's aunt, Mary, was also at the home. At some point, Ms. Bagdasian took a shower in her parents' main bathroom. When she finished, she noticed a book of matches lying underneath a basket of wash cloths on the sink and, upon removing them for fear that they might fall into the hands of small children in the house, observed some

---

1. As we pointed out in *Perry v. State,* 357 Md. 37, 52 n. 7, 741 A.2d 1162, 1170 n. 7 (1999), there are two acceptable spellings of the italicized word—"willful" and "wilful." The preferred spelling appears to be the former. The statute uses the one-l version, however, so, when quoting the statute, we shall as well. Otherwise, we shall use the preferred spelling.

wires going into and out of the towel basket. In the basket itself, she discovered a black box to which the wires were attached. Ms. Bagdasian did not know what the item was and examined it several times. After dressing, she called her father into the bathroom and, together, they examined the box. Noticing that the wires ran behind the splash panel of the sink, she opened the drawers of the sink cabinet and, in one of them, found a video camera. Unable to view the tape in the camera because the battery was dead, Ms. Bagdasian removed the entire apparatus. She was able later to watch the tape and saw that it revealed her going to the bathroom, taking a shower, and drying herself, as well as her father and her examining the box. The tape also recorded the conversation she and her father had.

Ms. Bagdasian and her father testified that they had not given permission to anyone, including Deibler, to place the camera in the bathroom or to record any conversation. She said that, upon watching the tape, she became aware that Deibler had placed the camera, "because he videotaped himself setting it up." When Deibler came back into the house and entered the bathroom, Ms. Bagdasian listened at the door and heard him "routing [sic] through the drawers." When he came out, "he was kind of turning in circles and as white as a ghost, because he knew that the camera was gone." Ms. Bagdasian turned the tape over to the State's Attorney's Office.

Deibler stipulated at trial that his countenance and his voice were, indeed, on the tape and that "he did place that tape in the bathroom." The tape was played at trial, and the court announced that it was able to hear "a snippet" of conversation. Defense counsel acknowledged that he, too, could hear voices on the tape and that Deibler "does not deny that there are voices on there." Ms. Bagdasian testified that she was able to ascertain from the tape the conversation she had with her father in the bathroom, and she identified the voices on the tape as those of her father and herself.

David Cordle, the chief criminal investigator for the State's Attorney's Office, stated that, in response to Ms. Bagdasian's complaint, he met with her and watched and listened to the tape. After some background investigation, he obtained a search warrant for Deibler's home and, in execution of the warrant, observed and seized a considerable amount of video, recording, and other electronic equipment. Cordle then contacted Deibler who, in a subsequent conversation, acknowledged that the equipment found in the Bagdasian bathroom was his and that this was essentially "voyeurism taken a step too far." Cordle demonstrated and explained in court that, in order to record sound, an audio wire had to be plugged into the video device.

For reasons not clearly explained in the record before us, Cordle investigated other possible surreptitious filming of women by Deibler and spoke to some of them. About three weeks after his initial conversation with Deibler, upon returning from vacation, Cordle found three messages on his telephone voice mail, all of which, it was stipulated, were from Deibler. The first message was very brief. Deibler said that Cordle had made it "personal." That was followed by the sound of Deibler cocking an automatic weapon and the closing comment, "Later." With respect to the sound of a weapon, Deibler stipulated at trial "that he did in fact do that. He did go like that with his weapon." Cordle testified that the message put him in fear that "someone was going to try to harm myself or my family." In the second message, Deibler complained that Cordle was "talking to people you had no business talking to for any reason," that Deibler did not "appreciate that," that he felt it was "way out of line," and that it was "really starting to piss me off." In the midst of some obscenities, Deibler threatened to get an attorney "and go after you." The third message stressed Deibler's view that Cordle had no case against him. None of the evidence seized, he asserted, was incriminating, and the tape found in the Bagdasian home did not constitute a violation of the wiretap law, in his opinion, because the Bagdasians were aware of the camera before they began speaking, indicating knowledge that

their conversation was being recorded. Deibler added in the third message an accusation that Cordle had "hit on" one of Deibler's friends, who would be prepared to testify in court to the harassment, and he asked that Cordle call him. Cordle stated that the three messages could have been left at any time on July 28, 29, or 30, 1999. One final call was made by Deibler, in which he left his cell phone number on Cordle's pager.

After listening to the four messages, Cordle called Deibler at home but, unable to reach him, left a message on his voice mail that Cordle wanted the calls to stop and that, if they did not, he might file additional charges against Deibler. No further calls were made to Cordle thereafter.

On this evidence, the court, sitting without a jury, convicted Deibler of violating § 10–402(a)(1), by willfully intercepting an oral communication, and of Article 27, § 555A(2), by making repeated telephone calls to Cordle with the intent to annoy or harass him. Upon those convictions, Deibler was sentenced to an aggregate of five years in prison, with all but six months suspended, the six months to be served in home detention. Deibler appealed, and we granted *certiorari* on our own initiative, before any proceedings in the Court of Special Appeals, to consider whether (1) the element of willfulness in § 10–402(a) requires knowledge on the part of the defendant that his conduct was unlawful, (2) Mr. and Ms. Bagdasian had a reasonable expectation of privacy with respect to their intercepted conversation when (allegedly) it occurred after they discovered the recording device, and (3) the trial court erred in concluding that the three calls made to Cordle constituted a pattern of repeated calls with intent to annoy, abuse, torment, harass, or embarrass.

## DISCUSSION

### *The Wiretap Law*

Maryland Code, § 10–402(a)(1) of the Courts and Judicial Proceedings Article makes it unlawful for any person to "[w]ilfully intercept ... any wire, oral, or electronic communi-

cation." As we noted in *Perry v. State, supra,* 357 Md. at 64, 741 A.2d at 1177, the violation of that provision carries both criminal and civil sanctions— § 10–402(b) makes the violation a felony; § 10–410(a) creates a civil cause of action against the perpetrator; and § 10–405 makes the product of the unlawful interception inadmissible in evidence against the victim of the interception. Although the Court of Special Appeals has interpreted the element of willfulness as requiring that the interceptor know that his or her conduct is unlawful, *see Hawes v. Carberry,* 103 Md.App. 214, 222, 653 A.2d 479, 483 (1995) and *Fearnow v. Chesapeake & Potomac Telephone Co. of Maryland,* 104 Md.App. 1, 23–24, 655 A.2d 1, 11–12 (1995), *rev'd on other grounds,* 342 Md. 363, 676 A.2d 65 (1996), we have not previously addressed the issue.

A computer search reveals that the word "willful," in one form or another, appears 547 times in the Maryland Constitution, Code, and Rules in a variety of contexts. As the Supreme Court has noted, it "is a 'word of many meanings,' and 'its construction [is] often . . . influenced by its context.'" *Ratzlaf v. United States,* 510 U.S. 135, 141, 114 S.Ct. 655, 659, 126 L.Ed.2d 615, 622 (1994) (quoting from *Spies v. United States,* 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418, 422 (1943)). Perkins and Boyce agree, observing that, as used in criminal statutes, the word has been construed to mean "only intentionally or purposely as distinguished from accidentally or negligently and does not require any actual impropriety," but that it has also been held to require "a bad purpose or evil intent." R. PERKINS AND R. BOYCE, CRIMINAL LAW 875–76 (3d ed.1982). *See also* S. Brogan, *An Analysis of the Term "Willful" in Federal Criminal Statutes,* 51 NOTRE DAME LAWYER 786 (1976).

Brogan notes that the term, as used in Federal criminal statutes, "has defied any consistent interpretation by the courts, while legislatures have similarly neglected to clearly define its meaning." *Id.* at 786. He points out that "willful" has received four different constructions from the courts. The first, and most restrictive, is that an act is willful only if it is done with a bad purpose or evil motive—deliberately to violate

the law. A second interpretation considers an act to be willful "if it is done with an intent to commit the act and with a knowledge that the act is in violation of the law." *Id.* at 787. That construction does not require that the defendant possess a sinister motivation, but, like the first interpretation, it does require knowledge that the act is unlawful. The third interpretation "requires only that the act be committed voluntarily and intentionally as opposed to one that is committed through inadvertence, accident, or ordinary negligence." Under that approach, "[a]s long as there is an intent to commit the act, there can be a finding of willfulness even though the actor was consciously attempting to comply with the law and was acting with the good faith belief that the action was lawful." *Id.* What is required is "an objective intent to commit the act but not necessarily a knowledge that the act will bring about the illegal result." *Id.* Finally, Brogan notes that some courts have gone so far as to find an act willful even though it was not committed intentionally, but through oversight, inadvertence, or negligence.

The United States Senate Judiciary Committee has recognized the bewildering array of definitions given to the term as used in Title 18 of the U.S.Code. In Senate Report No. 307 (97th Congress, 1st Session, 1982), filed in connection with the proposed Criminal Code Reform Act of 1981, the Committee concluded that judicial construction of "willful" has been "often inconsistent and contradictory." *Id.* at 64. It noted that the courts had defined a "willful" act as "an act done voluntarily as distinguished from accidentally, an act done with specific intent to violate the law, an act done with bad purpose, an act done without justifiable excuse, an act done stubbornly, an act done without grounds for believing it is lawful, and an act done with careless disregard whether or not one has the right so to act." *Id.* The Committee recommended eliminating the word from the Federal Criminal Code. *Id* at 65.[2]

---

**2.** The proposed legislation would have reduced from 78 to four the mental states for criminal culpability—intentional, knowing, reckless, and negligent. The bill, which was an omnibus substantive revision of

We too have construed "willful" in several different ways. In *Ewell v. State*, 207 Md. 288, 299, 114 A.2d 66, 72 (1955), we noted that "[t]he term 'willfully' in criminal statutes has been said '... to characterize an act done with deliberate intention for which there is no reasonable excuse ...' " (quoting in part from *Rosenberg v. State*, 164 Md. 473, 476, 165 A. 306, 307 (1933)). *Ewell* involved a prosecution for criminal non-support, and we held that, to sustain the conviction, there must be evidence that the defendant "intentionally refused to support his wife, although he had the capacity to do so." *Id.*

For purposes of the perjury law—willfully making a false oath or affirmation-we said that, "[t]o be willful, the false oath must be deliberate and not the result of surprise, confusion, or bona fide mistake." *State v. Devers and Webster*, 260 Md. 360, 372, 272 A.2d 794, 800, *cert. denied*, 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971). With respect to the arson law, which made it unlawful to "willfully and maliciously" set fire to certain structures, we distinguished "maliciously" from "willfully" and held that the latter was "commonly interpreted as meaning 'intentionally,' " *Brown v. State*, 285 Md. 469, 475, 403 A.2d 788, 792 (1979), or as requiring a "deliberate intention to injure the property of another." *Shell v. State*, 307 Md. 46, 68, 512 A.2d 358, 369 (1986). In *McBurney v. State*, 280 Md. 21, 29, 371 A.2d 129, 134 (1977), we observed that "willfully" could connote either "intentionally or purposely as distinguished from accidentally or negligently" or "something more—that the acts were done with an actual impropriety, that is with a bad purpose or without justifiable excuse." The prosecution was of an attorney for willfully violating a statute precluding attorneys from co-mingling client funds and using them for an unauthorized purpose. We concluded that the element of willfulness did not make the offenses specific intent crimes

---

Title 18, did not pass; a motion for full Senate consideration was withdrawn after a cloture motion failed. The failure of the bill is not important with respect to the issue here. Of significance is the Committee's concern, in 1981, over the array of definitions given to the term "willful"—a concern that led, five years later, to the deletion of that term from the Federal wiretap law, for much the same reason.

and that "[a] practical effect of the requirement of a 'wilful' violation as a condition for conviction is to remove the offenses beyond any doubt from being considered as *malum prohibitum* which would dispense with the necessity for even a general criminal intent so that the mere fact of the commission of the prohibited acts would support a conviction." *Id.* at 29 n. 6, 371 A.2d at 134 n. 6. *See also Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 482–83, 671 A.2d 463, 480 (1996).

In attorney grievance matters based on the willful failure to file tax returns, we have defined willfulness in the context of 26 U.S.C. § 7203 to be the "voluntary, intentional violation of a known legal duty" not requiring a deceitful or fraudulent motive. *Attorney Grievance Comm'n v. Boyd,* 333 Md. 298, 309, 635 A.2d 382, 387 (1994); *Attorney Grievance v. Gavin,* 350 Md. 176, 191, 711 A.2d 193, 200 (1998). A "wilful violation" of the insurance law, we said in *Nuger v. Insurance Comm'r,* 238 Md. 55, 67, 207 A.2d 619, 625 (1965), means "an intentional act of omission or commission." The element of willfulness in the crime of murder requires "a specific purpose and design to kill." *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980).

Most of these interpretations, although not all, have been consistent with the third approach noted by Brogan—requiring only that the act be committed intentionally, rather than through inadvertence.

██ When construing a statutory term, of course, we need to give it the contextual meaning most probably intended by the Legislature, and, if the term is not susceptible to a single common meaning, we must look at relevant legislative history in an attempt to discern that intent. We have pointed out many times that, notwithstanding some important additional protections included in the Maryland wiretap law, our law generally "is modeled upon the federal act, 18 U.S.C. §§ 2510–2520, and extensively tracks its provisions." *Wood v. State,* 290 Md. 579, 583, 431 A.2d 93, 95 (1981); *Mustafa v. State,* 323 Md. 65, 69, 591 A.2d 481, 483 (1991). In particular, § 10–402(a)(1), making it unlawful for any person willfully to inter-

cept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire communications, is almost identical to the version of § 2511(1) of the Federal Act that was in effect in 1977, when § 10–402 was enacted. We may look, then, to see how that version of the Federal Act has been interpreted. *Kassap v. Seitz,* 315 Md. 155, 553 A.2d 714 (1989); *Ricks v. State,* 312 Md. 11, 537 A.2d 612, *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988).

Notwithstanding the considerable legislative history of the Federal wiretap law, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968, scant attention appears to have been given by Congress to the use of the word "willfully." The only reported reference to the term is in Senate Judiciary Committee Report No. 1097, at 93, where the Committee simply noted the requirement that a violation of § 2511(1) be "willful to be criminal" and cited, in parenthesis and without explanation, *United States v. Murdock,* 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933). *Murdock* involved the prosecution of a taxpayer for refusing to give testimony concerning certain deductions on his tax return. Such refusal was punishable only if "willful," and the Court was called upon to determine whether a refusal based on a subjective good faith belief that the answers might tend to incriminate the defendant was "willful." In that context, the Court noted that the word "often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental," but that, when used in a criminal statute, "it generally means an act done with a bad purpose." *Id.* at 394, 54 S.Ct. at 225, 78 L.Ed. at 385. The Court went on to observe that the word "is also employed to characterize a thing done without ground for believing that it is lawful," or conduct "marked by careless disregard whether or not one has the right to so act." *Id.* at 394–95, 54 S.Ct. at 225, 78 L.Ed. at 385.

Although the Senate Committee's focus was on the word in a criminal context, a violation of § 2511(1) also entails civil liability, and, as noted, the courts have concluded that the word "willfully" means the same for both purposes. *See Citron v. Citron,* 722 F.2d 14, 16 (2d Cir.1983), *cert. denied,*

466 U.S. 973, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984); *Malouche v. JH Management Co., Inc.,* 839 F.2d 1024, 1025–26 (4th Cir.1988). The *Citron* court, noting the Senate Committee's reference to *Murdock,* held that the word "willfully" denoted "at least a voluntary, intentional violation of, and perhaps a reckless disregard of, a known legal duty." *Citron,* 722 F.2d at 16. The *Malouche* court reached the same conclusion, determining that the plaintiff in a civil action under the Act was required to establish "an intentional or reckless disregard of its legal obligations" by the defendant. *Malouche,* 839 F.2d at 1026. *See also Benford v. American Broadcasting Co.,* 649 F.Supp. 9, 10 (D.Md.1986). As noted, the Court of Special Appeals has adopted a similar view. *See Hawes v. Carberry, supra,* 103 Md.App. at 222, 653 A.2d at 483; *Fearnow v. Chesapeake Telephone, supra,* 104 Md.App. at 23–24, 655 A.2d at 12.

Notwithstanding these decisions, there is significant evidence that Congress did *not* intend the word "willfully," as used in § 2511, to have such a restrictive meaning-to require that the person intercepting a communication know that his or her conduct was unlawful, or that the person act with reckless disregard of whether the conduct was lawful, or that the interception be made for an improper motive or bad purpose. An early clue appears in an article written by one of the principal draftsmen of the Federal law, Professor G. Robert Blakey, of the Notre Dame Law School. In *A Proposed Electronic Surveillance Control Act,* 43 NOTRE DAME LAWYER 657, 666 (1968), Professor Blakey also cites *Murdock* in noting that violations must be willful but concludes only that "good faith mistakes under the statute will not be subject to criminal sanctions."

In 1986, Congress decided that the word was too amorphous and replaced it throughout the wiretap law with the word "intentionally." Electronic Communications Privacy Act of 1986, Pub.L. 99–508. The House version of the bill, which made many other changes to the law, kept the term "willfully," but the House Judiciary Committee made clear that it did not intend for the word to have too restrictive a meaning. In

House Report 99–647 (90th Congress, 2d Session, accompanying HR4952), the Judiciary Committee, citing Brogan's article in 51 Notre Dame Lawyer, noted that the courts had construed "and misconstrued" the term and declared its intent that it "have the same meaning as the term intentional." *Id.* at 48. The term "intentional," it said, "does not require that the act was committed for a particular purpose or motive," and, by retaining the term "willful," the Committee "precludes the application of civil or criminal liability for acts of inadvertent interception." *Id.* at 49. The Senate decided to eliminate the word altogether, and its decision ultimately prevailed. Its intent was clearly expressed: "The purpose of this amendment is to underscore that inadvertent interceptions are not crimes under the Electronic Communications Privacy Act [the Act that made the amendments to § 2511]." Senate Report 99–541 at 23, U.S.Code Cong. & Admin.News 1986, 3555 at 3577. The Senate reverted to the views expressed five years earlier in connection with the proposed Criminal Code Reform Act of 1981: "A common means to describe conduct as intentional, or to say that one causes the result intentionally, is to say that it is done or accomplished 'on purpose.'" Senate Report 99–541 at 23, U.S.Code Cong. & Admin.News 1986 at 3577 (quoting from House Report 97–307, *supra*).

In *Earley v. Smoot*, 846 F.Supp. 451, 453 (D.Md.1994), the court regarded the 1986 amendment as "dilut[ing] the standard of proof from wilfulness to mere intent, after holdings that the wilfulness standard required proof of knowledge of the unlawfulness of the interception." Under the "intent" standard, the court concluded that liability could be imposed under § 2511(1)(a) "merely for intentional—in the traditional sense of purposeful—conduct, without a showing of disregard of a known legal duty." *Id.* It held that "a defendant who actually intercepts a conversation in a prohibited fashion need not be proved to have known his conduct was illegal." *Id.* We agree with the second conclusion as to what is required, but we are inclined to the view that, by substituting the word "intentional" for "wilful," Congress was not intending to "dilute" the standard as much as to return it to what Congress

initially had in mind. We draw from the various Senate and House Reports quoted above a belief on the part of Congress that some of the Federal courts had misconstrued the legislative intent, principally from the cryptic reference in Senate Report 1097 to the *Murdock* case, and that its intent could be made more clear if it simply eliminated the word "willful," which was the source of the confusion.

■ As we indicated, this moderate conception of the required mental state—purposeful conduct, requiring neither a bad motive nor knowing unlawfulness—comports, for the most part, with how we have defined "willful," as the term is used in other Maryland criminal statutes. It is a sensible and appropriate definition, given its application not only to criminal prosecutions under § 10–402(b), but also to civil liability under § 10–410 and suppression motions under §§ 10–408(i) and 10–405. We hold, therefore, that, for purposes of § 10–402(a), and thus for purposes of §§ 10–405, 10–408(i), and 10–410, an interception that is not otherwise specifically authorized is done willfully if it is done intentionally-purposely. That excludes interceptions arising from inadvertence or simple negligence, which may occur in a variety of ways.

■ It was never in dispute that Deibler placed the recording device, with an audio attachment, into the Bagdasian bathroom deliberately and intentionally. There was not even a hint of inadvertence in his doing so. The question, then, is whether the evidence sufficed to show that he intended to intercept an oral communication. In this regard, it is important to keep in mind that the wiretap law prohibits the interception only of wire, oral, or electronic communications, as those terms are defined in § 10–401. Clearly, there was no interception of a wire or electronic communication here.[3] Sec-

---

**3.** Section 10–401(1) defines a "wire communication" as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of a connection in a switching station) furnished or operated by any person licensed to engage in providing or operating

tion 10–401(2) defines an "oral communication" as "any conversation or words spoken to or by any person in private conversation." Ordinarily, the interception of such a conversation anticipates an aural interception—hearing the conversation directly or making a recording of it that can be listened to simultaneously or at a later time, and thus, in *Ricks v. State*, 312 Md. 11, 537 A.2d 612 (1988), we held that a video surveillance, though in many respects a greater intrusion on privacy than an audio surveillance, was not prohibited by § 10–402.[4] The unlawfulness in this case thus hinges on Deibler's interception of the words spoken by Mary Bagdasian and her father, through the audio recording attachment.

Deibler does not contest that the audio recording attachment was intentionally and deliberately installed for the purpose of intercepting any sounds emanating from the bathroom. His point is that no words or conversation were uttered by the Bagdasians until *after* they had discovered the hidden equipment, that they were therefore on notice that their conversation was being recorded, and that, accordingly, they could have no legitimate expectation of privacy with respect to that conversation. Deibler made that argument to Cordle in one of his telephone messages, and he makes it again to us.

---

such facilities for the transmission of communications," including an electronic storage of a communication but excluding the radio portion of a cordless telephone communication transmitted between the cordless telephone handset and the base unit. An "electronic communication" is defined in § 10–401(11) as a "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system," subject to certain exclusions.

4. It was not necessary to consider in *Ricks* and it is not necessary to consider here whether a video-only interception of a conversation may constitute a violation of § 10–402 if, by watching or playing the video, it would be possible, through lip-reading or some electronic means, to identify the words spoken. We note that, in 1999, the Legislature addressed the problem of video surveillance of events in private residences and made it unlawful for a person to "place or procure another to place a camera on real property on which is located a private residence for purposes of conducting deliberate surreptitious observation of a person inside the private residence." *See* 1999 Md. Laws, ch. 377, enacting Maryland Code, Article 27, § 579A.

Deibler's argument fails in this case because it is not supported by the facts. When Ms. Bagdasian discovered the black box, she did not know what it was; nor did her father when he first examined it. The conversation that was recorded—at least part of the conversation recorded—involved the two discussing what the item was. Not until Ms. Bagdasian opened the cabinet drawer and saw the camera itself did she realize that someone had been videotaping her, and not until she actually played the tape in her friend's VCR did she realize that her voice had been recorded. Mr. Bagdasian gave similar testimony. He did not know when he first observed the device that he was being recorded: "At that particular time I didn't know what it was, at first. We—my daughter asked me if I knew anything about it, or what it was all about, and I said, 'No, I don't.' "

On this record, it is clear that Deibler intentionally and deliberately intercepted an oral communication in violation of § 10-402, and that his conviction under that section is valid.

### *Telephone Abuse*

 Maryland Code, Article 27, § 555A makes it unlawful for a person to make use of telephone facilities or equipment for certain anonymous calls, for certain obscene calls, and "for repeated calls, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons." We are concerned here with the quoted part, which requires proof of three things: criminal agency—that the defendant made the calls; that there were "repeated calls"; and that the calls were made with one of the requisite intents.

Criminal agency has been conceded, and Deibler does not directly contest that three calls (or four, if the one leaving his cell phone number is counted) may qualify as "repeated." He concedes as well that the first call, in which the sound of an automatic weapon being cocked was recorded, suffices as being with the intent to annoy or harass. His argument is that, given that there were only three calls made within a short period of time to a public official, that there was no

direct conversation but only a voice-mail message, and that only the first call could be regarded as made with the intent to annoy or harass, there was insufficient evidence to show a violation of the statute. He cannot properly be convicted, he avers, on the basis of just one annoying or harassing call. He is correct.

Statutes like § 555A have been enacted by Congress and by many States. *See* 47 U.S.C. § 223, prohibiting obscene or harassing telephone calls in the District of Columbia and in interstate or foreign commerce; *see also Validity, Construction, and Application of State Criminal Statute Forbidding Use of Telephone to Annoy or Harass,* 95 A.L.R.3d 411 (1979 and 2001 Supp.). As might be expected, the cases arising under these statutes have involved a variety of fact patterns which, together with variations in the wording of the statutes, account for decisions affirming or reversing particular convictions. Courts have looked, among other things, to the number of calls, when during the day or night they were made, the period during which the calls were made, whether the calls were clustered or strung out over a period of time, the relationship between the caller and the victim, the nature and content of any message imparted during the calls, whether the caller remained anonymous, and, though not controlling, the effect of the calls on the victim, in determining the caller's intent. *See,* in Maryland, *Caldwell v. State,* 26 Md.App. 94, 337 A.2d 476 (1975); *von Lusch v. State,* 31 Md.App. 271, 356 A.2d 277 (1976), *rev'd on other grounds,* 279 Md. 255, 368 A.2d 468 (1977); *von Lusch v. State,* 39 Md.App. 517, 387 A.2d 306, *cert. denied,* 283 Md. 740 (1978); *see also* cases reviewed in the A.L.R. annotation cited above, 95 A.L.R.3d 411 (1979 and 2001 Supp.).

We have found no case quite like the one before us in which a conviction has been sustained. The second and third calls were, in some respects, intemperate, but they really relayed nothing more than Deibler's concern and frustration over Cordle's investigation. The only threat made was to take legal action, and, when Cordle demanded that the calls cease,

they did. We do not believe that the three calls made in this case sufficiently evidenced any of the requisite intents.

JUDGMENT ON CRIMINAL INFORMATION K–1999–1480 (WIRETAP) AFFIRMED; JUDGMENT ON CRIMINAL INFORMATION K–1999–1479 (TELEPHONE ABUSE) REVERSED; COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND ANNE ARUNDEL COUNTY.

HARRELL, J., dissents and files opinion in which BELL, C.J. and BATTAGLIA, J. concur in part and dissent in part.

HARRELL, Judge, dissenting.

I dissent. The Majority's conclusion as to the interpretation to be given the willfulness/wilfulness element of the wiretap law, Maryland Code, Courts & Judicial Proceedings Art., § 10–402(a)(1), (Maj. Op. at 198–200) is wrong. I continue to "adhere like a barnacle to the clear definition of wilfulness provided in *Benford* [*v. [American Broadcasting Co., Inc.] ABC*, 649 F.Supp. 9, 10 (D.Md.1986)] and *Earley* [*v. Smoot*, 846 F.Supp. 451, 453 (D.Md.1994)]." *Fearnow v. C & P Telephone Co. of MD*, 104 Md.App. 1, 23–24, n. 20, 655 A.2d 1, 17–18, n. 20 (1995), *rev'd on other grounds*, 342 Md. 363, 676 A.2d 65 (1996); *see also Hawes v. Carberry*, 103 Md.App. 214, 220–222, 653 A.2d 479, 482–83 (1995). The Majority opinion fails to persuade my small mind (I authored the *Fearnow* opinion while serving on the Court of Special Appeals) that maintaining consistency in this regard is foolish.[5] Thus, although Deibler's conduct was morally reprehensible, the record of his trial fails to provide evidence of the degree of wilfulness required under Maryland's wiretap statute and, thus, his conviction thereunder should be reversed.

I also disagree with the Majority's reasoning and resolution of Deibler's telephone abuse conviction. Maj. Op. at 201–203.

---

**5.** "A foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines." Ralph Waldo Emerson, *Essays. First Series. Self–Reliance (1841).*

Despite the Majority's inability to find a "case quite like the one before us in which a conviction has been sustained" (Maj. Op. at 202), the present case is not so rare that we should overlook fundamental principles such as: (1) we review the record below by considering "whether, after viewing all of the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); and, (2) it is the responsibility of the trier of fact, not us, to draw reasonable inferences from basic facts to ultimate facts, to evaluate the credibility of witnesses, and to resolve conflicts in the evidence (e.g., *State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336 (1994)).

The trial court listened to the tapes of the three conversations and to Deibler's explanation that his intent was only to protest what he regarded as Cordle's lack of professionalism in his handling of the investigation. The court expressly disbelieved that explanation and found a lack of credibility in Deibler's testimony. The first message, with the cocking of the gun, the court found to be clearly threatening and with the intent to annoy or harass. With respect to the other two messages, the court found Deibler's tone to be angry and sarcastic, that he "unleashed a stream of profanity to express his discontent" but did little to articulate any specific complaint. In one, he threatened to "go after" Cordle, which the court found, in conjunction with the cocking of a gun in the first message, to constitute more than simply a complaint or a threat merely to take legal action against Cordle. For those reasons, the court found, beyond a reasonable doubt, that Deibler "did make repeated calls, with the specific intent to annoy, abuse, torment, harass and embarrass Mr. Cordle, in a deliberate attempt to persuade him to terminate his investigation."

We do not view each call an isolation, to see if it, alone, can be regarded as made with one of the requisite intents. When there are repeated calls, we must look at them together, to see if, from the aggregate, there is such an intent. The evidence

here supports the court's finding that Deibler made the calls with the intent to annoy or harass Cordle, in an effort to cause him to curtail his investigation. The anger and the threat to "go after" Cordle exhibited in the second call can take on a special meaning when coupled with the more blatant threat implicit in the first call. The innocent explanation offered by Deibler simply was not believed. The evidence sufficed to support the conviction. Therefore, I would affirm Deibler's conviction of the telephone abuse law.

Chief Judge Bell authorizes me to state that he joins only that part of this dissent regarding the wiretap conviction. He agrees with the majority regarding the telephone abuse conviction.

Judge BATTAGLIA authorizes me to state that she joins only that part of the dissent regarding the telephone abuse conviction. She agrees with the majority regarding the wiretap conviction.